WILLARD GOETCHEUS, Appellant, v. EDMUND S. MATTHEWSON et al., Respondents.

The jurisdiction of inspectors of election, under the statute of 1842 defining their powers and duties (chap. 130, Laws of 1842, title 4) in questioning a person challenged, is limited to inquiries in reference to his place of residence and qualifications as an elector, as prescribed by the Constitution (art. 2, §§ 1, 2). Where the challenge is upon a ground not affecting such qualifications, the inspectors have no jurisdiction to ask questions relating simply to the ground specified.

Accordingly *held*, where a person offering to vote was challenged as a deserter, and after taking the preliminary oath refused to answer questions upon that subject, and, thereupon, his vote was rejected by the inspectors, that they acted without authority, and were liable to an action for the damages resulting therefrom.

The provision of the act of Congress of 1865, in reference to the enrolling and calling out of the national forces (§ 21, chap. 79, Laws of 1865), which deprives deserters from the military service of the United States of the rights of citizens thereof, only applies to those duly convicted as deserters by a court of competent jurisdiction; and if it authorizes the rejection of the vote of a person thus convicted, it can only be upon proof by duly authenticated record of the conviction. He cannot be required to answer any questions in reference thereto.

*It seems*, that the action of inspectors in asking a question and in rejecting a vote because of a refusal to answer, is, in its nature, ministerial, not judicial; and the decision of the inspectors that the question did tend to test the voter's qualifications is not conclusive, but they act at their peril. (DWIGHT, C.; EARL, C., concurring.)

*It seems*, also, that if their action is, in its nature, judicial, if they knowingly put a question they have no right to ask, and because of a refusal to answer reject a vote through malice, they are liable. (DWIGHT, C.)

*Goetcheus* v. *Matthewson* (5 Lans., 214) reversed.

(Argued September 19, 1874; decided January term, 1875.)

APPEAL from judgment of the General Term of the Supreme Court in the third judicial department, in favor of defendants, entered upon an order denying a motion for a new trial and directing judgment upon a nonsuit ordered at the Circuit. (Reported below, 5 Lans., 214; 58 Barb., 152.)

This action was brought against defendants to recover damages for an alleged unlawful rejection by them, as inspectors of election, of plaintiff's vote.

The facts in the case were, substantially, as follows: The defendants, in the year 1868, were inspectors of election for the second election district of the town of Triangle, Broome county. The plaintiff had been duly registered as an elector of that district, and offered to vote there at the general election in that year (1868). At the time of registration a question was raised as to the plaintiff's right to vote, as it was claimed that he was a deserter from the military service of the United States. At that time the attention of the inspectors was called to a decision of the Court of Appeals (*Green* v. *Shumway*), since reported (39 N. Y., 318), but which was then read from a newspaper published in the city of New York, called The World. This decision was to the effect that a law requiring an elector, when challenged, to take an oath that he was not a deserter, was unconstitutional and void. After this decision was read the plaintiff's name was registered. At the time of the election the plaintiff's vote was challenged, on the ground that he was a deserter. Having taken the preliminary oath, he was asked if he had been in the military service of the United States. He answered in the affirmative. Then the chairman of the board of inspectors asked him if he had an honorable discharge. This question he refused to answer. He was then asked if he left the service without leave. An answer to this inquiry was also declined. The challenge having been persisted in, and the plaintiff having insisted upon taking the general oath, the majority of the board refused to administer the oath until he answered the questions, and his vote was accordingly rejected. Before such rejection the attention of the board was called to the fact that the secretary of State, in the election forms which he supplied to them, as inspectors, had expunged the answers (previously required) in reference to desertion.

The plaintiff alleged, in his complaint, that the defendants, well knowing that he was a lawful voter, willfully contriving and intending to deprive him of his rights and franchises as a citizen, refused to permit him to vote at the election referred

to. The defendants, in their answer, set up three grounds of defence : (1). They denied that they rejected the vote maliciously, and insisted that they had good right to exclude the plaintiff's vote, because he refused to comply with the rules of law in answering questions; (2). They averred that he was, in fact, a deserter, was challenged on that ground and his vote rejected, because he refused to answer proper questions; (3). They claimed that their duties were judicial in their nature, and that they were not liable to a civil action for an error of judgment.

The second of these answers was held, on demurrer, to be bad. (See 58 Barb., 152.) No evidence was offered at the trial to show the fact of desertion. On the trial the answer was amended so as to contain a direct denial of the charge of malice contained in the complaint, or of a wilfull refusal to allow the plaintiff to vote. After the plaintiff had rested the defendants moved for a nonsuit, on the ground that the plaintiff was not entitled to vote, because he had failed to comply with the statute, and on the further ground that there was no evidence that the defendants acted maliciously. The plaintiff's counsel requested to be allowed to go to the jury upon the question of damages, and, also, upon the question of malice.

These requests were denied and due exception was taken. The court directed a nonsuit, the exceptions to be heard at first instance at General Term.

*John C. Hunt* for the appellant. Plaintiff was illegally deprived of his right to vote by defendants. (39 N. Y., 418; 40 How. Pr., 97.) Defendants were ministerial officers, and as such are not protected in their erroneous decisions affecting others' rights. (4 Hill, 632; 1 Den., 457; 3 N. Y., 463; 27 id., 45; 34 id., 389, 395; 32 id., 489; 13 Smith, 45; 8 id., 309.)

*Giles W. Hotchkiss* for the respondents. Defendants had a right to ask plaintiff all questions which, in their judgment,

would tend to test his right to vote.   (1 R. S. [5th ed.], 430;
1 Stat. at Large, 127.)   There being no evidence of malice
on the part of defendants, plaintiff was properly nonsuited.
(*Jenkins* v. *Waldron,* 11 J. R., 113;  *Green* v. *Shumway,* 39
N. Y., 418.)   Defendants acted judicially, and are not liable
civilly.   ( *Weaver* v. *Devendorf,* 3 Den., 117;  *Wilson* v.
*Mayor, etc., of N. Y.,* 1 id., 595;  *People* v. *Pease,* 27 N. Y.,
45;  *Tompkins* v. *Sands,* 8 Wend., 462;  *Jenkins* v. *Waldron,*
11 J. R., 114;  *Comm.* v. *Cuncanon,* 3 Brews. [Penn.], 344;
*Moran* v. *Remond,* id., 601;  *Walker* v. *Brockway,* 1 Mich.,
57;  *Friend* v. *Hamik,* 34 Md., 14;  *Pike* v. *Morgan,* 44
Mo., 499;  *Rex* v. *Young,* 1 Burr., 566;  *Harman* v. *Tappenden,* 1 East, 256;  *Brown* v. *Smith,* 24 Barb., 422;  *Vail*
v. *Owens,* 19 id., 22.)

LOTT, Ch. C.   The second article of the Constitution of
this State, which was in force when the election in question
was held, prescribes who of its citizens and inhabitants shall
be entitled to vote at an election to be held therein for all
officers that are elected by the people, and provides that laws
may be passed excluding from the right of suffrage all persons who have been or may be convicted of bribery, larceny,
or of any infamous crime; and for depriving every person
who shall make, or become directly or indirectly interested
in, any bet or wager depending upon the result of any election, from the right to vote at such election.   (Secs. 1, 2.)   It
also directs that laws shall be made for ascertaining, by
proper proofs, the citizens who shall be entitled to the right
of suffrage thereby established.   (Sec. 4.)   The prior Constitution, adopted in 1846, contained the same provisions.

The legislature, on the 5th day of April, 1842, passed a
law (Laws of 1842, chap. 136) entitled, " An act respecting
elections other than for militia and town officers," which, as
amended from time to time, is still in force.   That law, at
the time of the general election in 1868, when the plaintiff
offered to vote, provided, by article second of its fourth title,
that if any person offering to vote at any election should be

challenged in relation to his right to vote at such election, by an inspector or by any other person entitled to vote at the same poll, one of the inspectors should tender to him a preliminary oath in the following words: "You do swear (or affirm) that you will fully and truly answer all such questions as shall be put to you touching your place of residence and qualifications as an elector." It then declared that the inspectors, or one of them, should proceed to question the person challenged in relation to his name, his place of residence, his citizenship, and certain other matters particularly specified, and then ask him all such other questions "as might tend to test his qualifications as a resident of the town or ward, citizenship and right to vote at that poll." (Secs. 13, 14.) It then contains these provisions (sec. 15): "If any person shall refuse to take the said preliminary oath when so tendered, or to answer fully any question which shall be so put to him, his vote shall be rejected." (Sec. 16.) "After receiving the answers of the persons so challenged, the board of inspectors shall point out to him the qualifications, if any, in respect to which he shall appear to them to be deficient." (Sec. 17.) "If the person so offering shall persist in his claim to vote, and the challenge shall not be withdrawn, one of the inspectors shall then administer to him the following oath," which is then set forth, and is, substantially, to the effect that he possesses all the requisite qualifications of an elector and had the right to vote.

The plaintiff was challenged when he offered to vote "on the ground of being disfranchised, as a deserter;" and having taken the preliminary oath, was asked by the chairman of the board of inspectors (composed of the defendants), if he had been in the military service of the United States; his answer was that he had. He was then asked if he had an honorable discharge therefrom; he refused to answer that question; and being further asked if he left the service without leave, he also refused to answer that question. On such refusal, the majority of the board — the challenge not being withdrawn — rejected his vote, although he persisted in his

right to vote, and take the general oath above referred to. In this they acted without authority and beyond their jurisdiction; and their rejection of his vote made them liable to him for the damages resulting to him therefrom.

The inspectors of election have the right to ask a person who offers his vote, when challenged, after questioning him on the matters specially designated, such other questions "as may tend to test his qualifications as a resident of the town or ward, citizenship and right to vote" at the poll where he is challenged, and it may be conceded that they act in a *quasi judicial* character in putting "such other questions" and in determining whether he answers fully the questions which shall be put to him; but their jurisdiction and authority are limited to an inquiry in reference to his place of residence and qualifications as an elector, within the above mentioned requirements and provisions of the constitution. It appears to have been claimed in the court below that the twenty-first section of the act of Congress (chap. 79 of the Laws of 1865) entitled "An act to amend the several acts heretofore passed to provide for the enrolling and calling out the national forces, and for other purposes," approved March 3, 1865, deprived a deserter from the military service of the United States from exercising any rights of a citizen thereof, and that therefore the examination of the plaintiff in relation to that fact was authorized. This claim cannot be sustained. The provision, assuming it to be valid, could only apply to deserters duly convicted as such by a court of competent jurisdiction; and there was no proof offered or allegation made of such conviction. The challenge of the plaintiff's right to vote, on the ground of desertion, without the production of the record of his conviction of the offence, was consequently no more than a mere charge of its commission. It should have been disregarded, and did not justify the questions which he refused to answer. They would, indeed, have been unauthorized and improper, even if the challenge had been made on the ground of an actual conviction. The statute, under which they acted, provided as follows: "If

the person be challenged, as convicted of an infamous crime, he shall not be required to answer any questions in relation to such alleged conviction; nor shall any proof of such con viction be received, other than a duly authenticated record thereof." (Sec. 23.)

It thus appears that the inspectors, in asking the questions put to the plaintiff, and in refusing his vote because he would not answer them, acted in relation to a subject over which they had no jurisdiction, or any right to institute an inquiry. I will add that I have not found any statute of this State that required or authorized it.

The provision of the law (chap. 194 of the Laws of 1867) which was held to be unconstitutional and void by the Court of Appeals, in *Green* v. *Shumway* (39 N. Y., 418), and which appears to have been relied on as a justification of the action of the defendants in this case, was restricted in its operation to an election appointed to be held for the purpose of choosing delegates to meet in convention on the first Tuesday of June, 1867, to revise the Constitution of this State and to amend the same. The oath referred to in the testimony of one of the inspectors as that familiarly known as the "test oath," was, according to my understanding and construction of his evidence, the oath prescribed by that act, and was not applicable to voters at the general election at which the plaintiff's vote was rejected. The views above expressed show that the plaintiff was wrongfully deprived, by a majority of the inspectors, of his right to vote. The matter which was stated to be the ground of the challenge did not affect his qualification as an elector, and consequently, the questions asked of him in relation thereto were not within their jurisdiction, or in the discharge of their duty as inspectors.

This conclusion renders it unnecessary to decide or consider the question, much and ably discussed on the argument, whether inspectors, after having obtained jurisdiction of the subject by the challenge of a person's right to vote, can be held liable or responsible in a civil action for erroneously, in the exercise of their judgment, rejecting his vote on the

ground that he had refused to answer, either entirely or fully, any of the questions which they were required by the law to ask, or any other which they, in their opinion, deemed pertinent, and as tending to test his qualification as an elector and his right to vote. The question is not involved or raised by the facts in this case, and an expression of opinion thereon is consequently not proper, and would be useless.

The judgment must, on the ground stated, be reversed, and a new trial must be ordered, costs to abide the event.

DWIGHT, C. There were two questions involved in the disposition of this cause; one was, whether the act of the inspectors of election in rejecting the vote of the plaintiff was ministerial or judicial in its nature; the other was, if their act was judicial, they would be liable to him if they rejected his vote through malice, and if so, whether there was sufficient evidence of malice to go to the jury.

It is necessary, in order to dispose of the first question, to consider in the outset the provisions of the statute under which the inspectors acted.

The statutes provide that if any person offering to vote at an election shall be challenged, in relation to his right to vote, the inspectors shall tender to him the following preliminary oath: "You do swear that you will fully and truly answer all such questions as shall be put to you, touching your place of residence and qualifications as an elector." The inspectors, or one of them, shall then proceed to question the person challenged in relation to his name; his then place of residence; how long he has resided in the town or ward where the vote is offered; what was his last place of residence before he came into that town or ward, and also as to his citizenship, and whether a native or a naturalized citizen, and if the latter, when, where and in what court or before what officer he was naturalized; whether he came into the town or ward for the purpose of voting at that election; how long he contemplates residing in the town or ward, and all such other questions as may tend to test his qualifications as a

resident of the town or ward, his citizenship and right to vote at that poll.

"If any person shall refuse to take the preliminary oath, when tendered, or to answer fully any questions which shall be so put to him, his vote shall be rejected." (1 R. S. [Edmonds' ed.], 126, 127, §§ 13–15.)

It will be observed that the inspectors have no general power to put questions. The inquiries that they may make are specifically pointed out, until the general clause is reached : All such other questions as may tend to test the voter's qualifications. They are only allowed to reject the vote when the person offering it refuses to answer the questions so put to him. These provisions by no means allow the inspectors to put any question that they may see fit. Their questions must either be the particular inquiries specified in the statute, or must tend to test the voter's qualifications. No other questions can be asked; no vote can be rejected for a refusal to answer any other.

The great question then is : Who is to decide, ultimately, whether the inquiry made by the inspectors *does* tend to test the voter's qualification ? Is that the function of the inspectors, or is it the province of the courts in disposing of an action.

The counsel for the defendants takes strong and positive ground upon this subject. He maintains that the whole matter was addressed to them, and that the challenged party must respond fully to their inquiries if he wishes to vote, no matter how foolish the questions may in fact be, nor how impertinent the voter may consider them ; if they hold that the question may tend to test his right to vote he must answer it, or he cannot vote. This is a frank acceptance of the consequences of his position that the inspectors act in a judicial capacity. To every candid mind they must supply a strong argument against the correctness of his views, as the legislature could scarcely have intended to pass a statute whose provisions might be made so subversive of the rights of the citizen, or might be so successfully used by bad men to embarrass the quiet and orderly progress of an election.

I think that the inspectors, in *asking* the prescribed questions, act in a mere ministerial capacity. They have no right to ask any questions that the statute does not permit. Their decision that the question tends to test the qualifications of the proposed voter, does not give it that tendency, unless it does, *in fact*, possess it. In a disputed case, the matter can only be settled in a court of justice, in an action brought to test the inspectors' rights to ask the question, or in some other appropriate manner. *After a proper question has been asked*, the inspectors obtain jurisdiction over the subject to which the particular question refers, and their proceedings upon that point may partake, to some extent, of the nature of judicial action. It is not, however, necessary to determine that proposition. If this conclusion be right, the inspectors act at their peril. They must be sure to ask such a question as the statute prescribes; if they fail, they are liable to an action. If it be said that this is a harsh rule to apply to such officers as inspectors, who are, in the main, not skilled in the law, or who act under circumstances of haste and excitement, a ready answer is at hand. The statute has pointed out the specific questions that are most important. The inspectors may easily confine themselves to these. It can rarely be necessary to go beyond them. These propositions, which seem clear in point of principle, are well sustained by authority.

A similar doctrine is now well settled in this State, as to assessors of taxes. It is maintained, after long discussion, that they are subordinate officers, and must act within the authority given them. When their right to act depends upon the existence of some fact, an assessment founded upon an erroneous determination by them of the existence of such a fact is illegal. They cannot acquire jurisdiction by determining that they have it. (*Nat. Bk. of Chemung* v. *City of Elmira*, 53 N. Y., 49 ; *Mygatt* v. *Washburn*, 15 id., 321 ; *Whitney* v. *Thomas*, 23 id., 281 ; *Dorn* v. *Backer* ; * *Dorn* v. *Fox*, † Com. Appeals, 1874.) The case of *Nat. Bank of Chemung* v.

* *Ante*, p. 261.                          † *Ante*, p. 264.

*City of Elmira* plainly recognizes in the case of these subord-inate officers the distinction between their powers before they have acquired jurisdiction and their *quasi* judicial functions after it is obtained. CHURCH, Ch. J., says: " Some of the duties of assessors are judicial in their nature, and as to those, when acting within the scope of their authority, they are pro-tected from attack, collaterally, to the same extent as other judi-cial officers ; but they are subordinate officers, possessing no authority except such as is conferred on them by statute, and it is a well settled rule that such officers must see that they act within the authority committed to them. * * * So when their right to act depends on the existence of some fact, which they erroneously determine to exist, their acts are void. So in performing a ministerial duty, their acts are void, if not in accordance with law. But having jurisdiction of the per-son and subject-matter, if they err in the exercise of it, they are protected."

The same conclusion has been arrived at in the case of offi-cers having the special power by statute to put questions, and the authority to take ulterior measures in case those ques-tions are not answered. In *Miller* v. *Seare* (2 Wm. Black., 1141), commissioners of bankruptcy were held liable to an action for false imprisonment for having committed a bank-rupt for an answer not deemed by them to be satisfactory, the court holding that the answer was sufficient. The case of *Doswell* v. *Impey* (1 B. & C., 163), has sometimes been supposed to be adverse to this theory. That case, however, turned upon the peculiar language of the statute under which it was decided. That required that the bankrupt must make the answers to the " satisfaction " of the commissioners. The court held that under these words the commissioners had a right to determine whether the answers were sufficient.

In *Isaac* v. *Impey* (10 B. & C., 442), where no such special words were in the statute, the court followed the rule in the case in Sir W. Blackstone's reports. In that case the commis-sioners had power by statute to commit to prison a bankrupt if he refused to answer a question. They decided that asking

him to read an entry in a ledger was equivalent to asking him a
question, and committed him for a refusal to read it. The court,
in an action for false imprisonment, held that their course was
not authorized by the statute, and that they were liable. The
same doctrine was affirmed in the House of Lords in the
leading case of *Ferguson* v. *Earl of Kinnoull* (9 Cl. & Fin.,
251). In that case it was held that the act of a presbytery
in the established church of Scotland of taking on trial a
presentee for orders, was a ministerial act which the presby-
tery was bound to perform, and that for their neglect or
refusal to perform it every member of the presbytery, col-
lectively or individually, was liable to make compensation in
damages to the party injured. It was there held that per-
sons having judicial functions, but being also required to
perform ministerial acts, may be sued for damages occasioned
by their neglect or refusal to perform such ministerial acts.
In such a case no allegation of malice is necessary. The
opinion of Lord CAMPBELL presents this matter in a strong
light. He says : " Where there is a ministerial act to be
done by persons who on other occasions act judicially, the
refusal to do the ministerial act is equally actionable, as if no
judicial functions were on any occasion intrusted to them.
There seems to be no reason why the refusal to do a ministe-
rial act by a person who has certain judicial functions should
not subject him to an action in the same manner as he is lia-
ble for an act beyond his jurisdiction. The refusal to do the
ministerial act is as little within the scope of his function as
judge as the act when his jurisdiction is exceeded. In the
act beyond his jurisdiction he has ceased to be a judge. As
to the ministerial act which may be initiatory to a judicial
proceeding, he is not yet clothed with the judicial character."
(P. 312.) The doctrine thus enunciated is by no means a
new one, but finds support in the ancient cases. In *Green's
Case* (1 Leonard, 323), a person applied to a justice of the
peace to take his examination, under the statute of Eliza-
beth (known as the statute of "Hue and Cry"). His
application was refused, and the justice was held liable to

an action for damages, the applicant having sustained injury in consequence of the refusal. The same general result was reached in *Sterling* v. *Turner, Lord-Mayor of London* (cited 9 C. & F., 280). Sterling was a candidate for the office of bridge-master. The lord-mayor refused to take a poll of the votes. Sterling brought his action against the mayor and recovered. The only elements necessary to the action are the duty to do the act, neglect of it, and consequent injury to the plaintiff.

Questions of this kind, it is manifest, can only be properly decided by reference to the particular statute under which they arise. The law may, in a particular case, give inspectors a discretion. In this case they will not be liable simply for an erroneous exercise of it, but almost only for malicious conduct. Where, on the other hand, the law denies a discretion, but chalks out the line which they must pursue, they are bound to follow it. The rule, then, may be stated in this form : Where the law neither confers judicial power nor any discretion at all, but requires certain things to be done, every body, whatever be its name and whatever other functions of a judicial nature it may have, is bound to obey, and is liable to an action for disobedience. (*Ferguson* v. *Earl of Kinnoul, supra,* 290.)

The case of *Teall* v. *Felton* (1 N. Y., 537; affirmed, 12 How. [U. S.], 284), is strongly illustrative of the principle. The statute law of the United States had provided, that a postmaster was to charge letter postage upon a newspaper passing through the mails, by or upon which information should be communicated in writing or by marks and signs. The postmaster having decided that an initial upon a newspaper did communicate such information, refused to deliver the paper unless the postage was paid. An action of trover was brought against him. The Court of Appeals held, that his decision was reviewable by a jury, and that as they found that the initial did not " communicate information " he was liable. Although the postmaster had, in one sense, to exercise judgment, yet as the act was not judicial in its nature,

in such a sense as to make his decision final, and having assumed to decide, he acted at his peril. The Supreme Court of the United States thought, in the same case on appeal, that the postmaster acted ministerially, rather than judicially; and having made a mistake, though in good faith, he was responsible. The court said, "that the difference between a judicial and ministerial act must, at all times, be determined by the law under which an officer is called upon to act, and by the character of the act." (12 How. [U. S.], 291; see, also, *Cullen* v. *Morris*, 2 Starkie, 481; *Tozer* v. *Child*, 6 E. & B., 289; S. C., Ex. Cham., 7 id., 317.)

There can be no reasonable doubt that this general doctrine is applicable to returning officers and inspectors of election. This appears to have been conceded in a recent English case under the statute of 6 and 7 Victoria, chapter 18, section 82. The court was of opinion, that under that act the duties of the returning officer were ministerial, and that an action would lie for a wrongful refusal to return a vote, though in the particular case before them no action was maintainable, because the party bringing the action did not happen under the terms of the statute to be entitled to a vote. (*Pryce* v. *Belcher*, 3 C. B., 58; 4 id., 866.) At the same time, under other circumstances, the inspector or returning officer might be deemed to act judicially, as in the case of *Ashby* v. *White*, to be hereafter considered more at large. The text writers on this subject agree with those views. Mr. Stephens raises the question, whether the act of a returning officer is judicial or ministerial. He concludes, that in those branches of his duty wherein the law has marked out a definite line it is ministerial, as in giving the requisite notice of the election, providing booths, administering the oath against bribery, receiving tenders of votes, under 2 William IV, chapter 45, section 59. But he adds that the sheriff is clearly a judicial officer under the same statute (§ 58) in the exclusion of voters, though on the register, if they refrain from answering, or answer improperly, the questions therein propounded. (Stephens on Elections, 74, 75.)

There is a marked difference between the former English law and the present, to which, if attention is not paid, the decisions will be misapprehended. Prior to the statute of William IV, which certainly makes, as has been seen, some of their duties ministerial, the returning officer was bound by his oath to make a return of that person as elected who, *in his judgment*, had the majority of *legal* votes. (Rogers on Elections, 246.) Under that state of facts it might well be held that the returning officer, in rejecting a vote, acted judicially, as the question, whether a vote was legal or not, was made to depend upon his judgment. Under the present law he can only put specified questions to the voter, as under the law of this State. In asking the specific questions, his functions are ministerial. He must ask no others than those designated. When a question allowed by law is asked, his judgment comes into requisition to determine whether a full response is made to it; in that respect, his power may be judicial.

The recent cases in Massachusetts, under the statutes of that State, are to be explained by this distinction. Under that law, the selectmen (having charge of the subject) are not responsible for any omissions in the list of voters, nor for refusing the vote of any person, etc., unless such person, before offering his vote, shall furnish them with *sufficient* evidence of his having the legal qualifications of a voter, and shall have requested them to insert his name on a voter's list. The qualifications of a voter are pointed out in the statute. The duty is thus imposed on the selectmen of coming to a just and reasonable conclusion upon the proofs offered by the applicant; and the question will be for the jury, in case an action is brought, to determine whether a claimant was possessed of the necessary qualifications, and whether his proofs were "sufficient" to warrant and require the selectmen to place his name on the list. It is not enough that the proof be satisfactory to the selectmen; it must be such proof as a jury may say was reasonably sufficient. (*Blanchard* v. *Stearns*, 5 Metc., 298.) Before this act selectmen had been

held liable, at all events, for refusing to receive the vote of a person legally qualified. (*Lombard* v. *Oliver*, 3 Allen, 1, per BIGELOW, Ch. J.; *Lincoln* v. *Hapgood*, 11 Mass., 350; *Gates* v. *Neal*, 23 Pick, 308; *Capen* v. *Foster*, 12 id., 485; *Bacon* v. *Benchley*, 2 Cush., 100.)

Mr. Cooley, in his work on Constitutional Limitations, lays down the rule to be, "that when the law invests the inspectors with power to pass upon the qualifications of electors, they exercise judicial functions in so doing, and are entitled to the same protection as other judicial officers, and cannot be made liable, except upon proof of express malice. When, on the other hand, their duties are only ministerial, they have no discretion but to obey the law and receive the vote." (P. 617, 1st ed.)

In *Anderson* v. *Millikin* (9 Ohio St., 568), the facts were that the Constitution of the State provided that *white* male inhabitants should vote; the inspectors of election decided that a particular voter was not white. The court went so far as to hold that, as the evidence showed that the voter was white, the inspectors were liable to an action, although they were actuated by no malice or ill will, but supposed themselves to be in the discharge of their official duty. (See, also, *Jefferies* v. *Ankeny*, 11 Ohio, 372.)

The case of *Gillespie* v. *Palmer* (20 Wis., 544), is of importance. The statutes of Wisconsin in regard to inspectors' powers closely resemble those of New York. It is provided that the voter shall answer certain prescribed classes of questions, and that the inspectors shall put all other questions to persons challenged under these respective heads as may be necessary to test the voter's qualifications. If the elector shall refuse to answer fully the prescribed questions, or any others touching his qualifications as an elector, the inspectors shall reject his vote. Under these statutory regulations it was held that the inspectors were ministerial officers. The court thereupon applied the rule that they were liable to an action for wrongfully refusing the plaintiff's vote, though the refusal was an error of judgment and without malice.

The application of these principles to the case at bar is obvious. The plaintiff's vote was challenged as that of a deserter from the military service of the United States. He was asked the question whether he had been in the service; he answered in the affirmative. He was then asked if he had an honorable discharge; he declined to answer. The inquiry was then put to him if he left the service without leave; an answer to this question was also refused. The plaintiff having insisted upon taking the general oath, the majority of the board refused to administer it until he answered the questions, and his vote was, accordingly, rejected.

In this course the inspectors erred; the questions were not permissible under the statute. (*Green* v. *Shumway*, 39 N. Y., 418.) Legally speaking, the question did not "tend to test the qualifications of the voter." They having erred in asking the question, have done an injury to the plaintiff in depriving him of his vote, and are accordingly liable to him in damages. The fact that inspectors, in such a case, act ministerially, appears to be affirmed in *People* v. *Pease* (27 N. Y., 65).

The law of New York, wisely, as we think, has largely left the right to vote, as far as the proceedings on election day are concerned, to the judgment and conscience of the elector. Most of the questions that may tend to excite a momentary irritation caused by the challenge are disposed of for the time being by his oath. If he willfully swears falsely, he is liable, on conviction, to a suitable punishment. If he is disqualified from voting, the error may be rectified, so far as it occasions harm, by an appropriate judicial proceeding. The questions provided by statute to be asked a challenged voter are few, and easily understood. It cannot be usually necessary for the inspectors to go beyond them. Additional inquiries (dictated, perhaps, by caprice, ill nature, or sense of short-lived power on the part of the inspectors) would be productive, in general, of but little good, and if multiplied, might cause delay, and breed much ill feeling. We think that sound

policy requires that inspectors should be held to close and rigorous rules in putting such additional questions as may suggest themselves to their minds, and that they must assume the risk of successful actions against them, in case that the courts should be of opinion that the inquiry does not come within the purview of the statute.

The case of *Jenkins* v. *Waldron* (11 J. R., 114), is not opposed to this result. That case turned upon the construction of a number of sections in chapter 36 of the Revised Laws of 1813. The substance of them was, that no black or mulatto person should present himself to vote at any election unless he should present to the inspectors a " certificate of freedom," under the hand of a town or county clerk. The person in question might exhibit proof before a justice of the Supreme Court, or a judge of any Court of Common Pleas, of his freedom. This proof having been reduced to writing, the judge thereupon issued his certificate setting forth certain prescribed facts, and this having been filed with either of the clerks above named, they were respectively authorized to give a certified copy of it. When this copy was produced before the inspectors, the black person desiring to vote might be required by them to make oath or affirmation that he was the identical person named in the certificate. (2 Rev. Laws, 253, 254, §§ 11 to 15.) Under this system of rules, when Waldron presented a certified copy of a " certificate of freedom," the inspectors held that the person who purported to issue it was not a judge of the Court of Common Pleas of Columbia county, as he assumed to be, and accordingly that the certificate was a nullity. It is plain that there is no real resemblance between this case and the one at bar. The question before the inspectors in *Jenkins* v. *Waldron*, was a point in the law of evidence on which they might fairly be held to act judicially. Whether EDMONDS (the judge who issued the certificate) was a judge *de jure* or one *de facto*, was one much argued by counsel on the facts of that case. The court held it to be immaterial whether he was either, since, as the inspectors had the power to decide the point, they were not

to be held liable, unless they were actuated by malice. The case simply holds that *when* the inspectors act judicially, they are not liable unless malice be present. It is of course of no authority on the matter of their liability, when they act ministerially, nor upon the line of distinction between their ministerial and judicial capacity, was not in question, and was in no respect considered.

The result is, that as the inspectors rejected the plaintiff, Goetcheus', vote, for a ground not within their statutory authority, they are liable to him in an action. In such cases as these, where the inspectors act in good faith, the action for damages should in general be regarded by juries as a mode of testing the plaintiff's right to vote, and the damages should be little more than nominal, or than enough to give him his costs. These remarks accord with the conclusions reached in other States of the Union, where actions of this kind have been held to be well brought.

II. Should, however, the preceding views be incorrect, it remains to inquire whether, though the inspectors in the present case acted judicially rather than ministerially, they would not be liable in the present action, if they acted maliciously in refusing the plaintiff's vote, and if so, whether there was not sufficient evidence of malice to go the jury?

It is, undoubtedly, a general rule of law that if a judicial officer, in making a decision upon a matter within his jurisdiction, acts erroneously, no action will lie against him for damages, even though he is actuated by malice. The remedy in such a case is not a private but a public one, as by indictment or impeachment. This general rule, applicable to judges of courts of record, does not extend to all judicial officers. In the case of inferior magistrates the act complained of, though judicial and within their jurisdiction, must, in order to shield them from responsibility, have been done honestly and in good faith. (Sher. & Red. on Negligence, § 160, and cases cited.) Accordingly, if malice is shown they will be liable to an action. In *People* v. *Pease* (27 N. Y., 65) the remark is made, that if inspectors of elec-

tion had acted as judicial officers no civil action would have lain against them, even if charged with malice. This, however, is but a *dictum*, and is not sustained by the authorities as to this class of officers. For a similar *dictum*, see *Weaver v. Devendorf* (3 Denio, 117, per Beardsley, J.).

That this rule is applicable to inspectors of election, is shown in the early case of *Ashby* v. *White* (Ld. Ray., 938). The question in that case was, whether a man who has a right to vote at an election for members of parliament may maintain an action against a returning officer for refusing to admit his vote, though his right was never determined in parliament, and though the person for whom he offered to vote was elected. The declaration in this cause set out the fact that the defendant fraudulently and *maliciously*, intending to damnify the plaintiff, refused to permit him to vote. Three of the judges (Lord Holt, dissenting) held, that the action was not maintainable. The judgment was reversed in the House of Lords, January 14th, 1703. The three judges in the court below did not agree in the reasons for their judgment. Gould, J., thought that the returning officer was a judge. Powys, J., thought he was a *quasi* judge. Powell and Holt, JJ., said that he was no judge and nothing like a judge, and was only an officer to execute a precept, etc. The theory on which the case was finally disposed of was, that the plaintiff having a right to vote he must, of necessity, have a legal means to vindicate and maintain it, and it was a vain thing to imagine a right without a remedy. The objection that no action was maintainable, because there was no hurt or damage to the plaintiff, was not available, because an injury imports a damage when a man is hindered of his rights. It was for many years considered doubtful whether the ingredient of fraud or malice had any connection with the judgment in this case. However, in a revised form of the judgment prepared by Lord Holt, he observed that, according to the very words of the statute of Westminster (originating actions on the case), the action would lie, because fraud and malice had been alleged in the declaration and proved at the trial. (Judg-

ment of Lord HOLT, in *Ashby* v. *White*, published by Sanders & Benning, A. D. 1837.) So, in an argument prepared by a committee of the House of Lords in the same case, fraud and malice are expressly stated to be of the gist of the action against an inferior judicial officer. The argument is, in substance, that there is no danger to an honest officer of this class who means to do his duty, for where there is a real doubt touching a party's right of voting and the officer *makes use of the best means to be informed*, and it is plain that his mistake arose from the difficulty of the case and not from any malicious or partial design, no jury will find an officer guilty in such a case. Nor can any court direct them to do it, for it is the fraud and the malice that entitle the party to an action.

It was held by Lord TENTERDEN, in *Cullen* v. *Morris* (2 Starkie, 481), that a part of a returning officer's duties were judicial and a part ministerial, and that the only mode of determining to which department any particular act belonged was to consider its nature and character. This view was approved in *Tozer* v. *Child.* It is now a settled law in England that if a returning officer have an act to perform which is, *in its nature, judicial*, no action will lie against him for an erroneous exercise of his discretion unless he be actuated by malice, or, in other words, unless he acts contrary to his convictions as to what is right and proper in the case. In that instance, he will be liable. The rule extends to other officers having analogous duties to perform. (*Drewe* v. *Coulton*, 1 East, 562, note *a ; Garnett* v. *Ferrand*, 6 B. & C., 625 ; *Kemp* v. *Neville*, 10 C. B. [N. S.], 523 ; *Tozer* v. *Child, supra ; Cullen* v. *Morris, supra ;* 2 Ludens on Elections, 245, note *f ; Burgoyne* v. ———, id., 246, *a ; Sargeant* v. *Milward,* id., 248, *a ;* Rogers on Elections, 246.)

This same view has been adopted in a number of our own States. In *Bevard* v. *Hoffman* (18 Md., 479) it was held that the office of an inspector of elections is, under the law of Maryland, in its nature, judicial; and, accordingly, that he cannot be held legally responsible for any thing more than an

honest and faithful exercise of his judgment, and is not liable
for the consequences of mistakes honestly made, though he
is responsible when actuated by malice. (See, also, *Chris-
man* v. *Bruce*, 1 Duvall [Ky.], 63 ; *Morgan* v. *Dudley*, 18
B. Mon., 711; *Carter* v. *Harrison*, 5 Blackf. [Ia.], 138 ;
*State* v. *Robb*, 17 Ind., 536.; *Pike* v. *Morgan*, 44 Mo., 409 ;
*Moran* v. *Rennard*, 3 Brewster, 601 ; *Weckerly* v. *Geyer*, 11
Sergt. & Rawle, 39 ; *Rail* v. *Potts*, 8 Humph., 225 ; *Jenkins*
v. *Waldron*, *supra ;* Bright's Cases on Elections, note to
*Jenkins* v. *Waldron*.)

Assuming, then, that the act of the inspectors in the present
case was judicial, and still that they would be liable for malice,
the final inquiry is, whether there was sufficient evidence of
willful wrong-doing to go to the jury. It seems plain that as
the existence of malice is a fact, it may be proved by the ordi-
nary evidence sufficient to establish facts of this kind. Direct
proof would be unnecessary. The existence of a bad intent may
be inferred from circumstances. In *Friend* v. *Hamill* (34
Md., 298), it was said that every fact and circumstance should
be allowed to go to the jury in proof of the fraudulent and
corrupt motives by which the defendants were influenced,
and that the defendant should be allowed to rebut such testi-
mony by circumstances showing good intent. Accordingly,
evidence as to the rejection of other votes on the same day
and of the reasons given by the inspectors for disallowing
them, was deemed admissible. So in *Elben* v. *Wilson* (33
Md., 135), it was held that the fact that the inspectors differed
from the voters in political sentiments may be considered by
the jury.

In the case at bar, the attention of the inspectors was dis-
tinctly called to the fact that there had been a decision of the
Court of Appeals to the effect that no such inquiry as that
concerning the plaintiff's desertion of military service could
be made of him. This notice was given to them on the day
of registry, several days before the election. The decision
itself was published at length in a newspaper of respectability
in the city of New York, and it was reasonable to believe

that a correct version of the opinion of the court was given. At all events, the inspectors had sufficient information to put them on inquiry. They gave no evidence at the trial to show that such an inquiry had been made, or that they had any ground to believe that the decision, as published in the newspaper, was incorrect.

It is a matter of common knowledge that decisions on important matters are thus published, and become a part of the current stock of information possessed by the people. It should be added, that the instructions furnished by the secretary of State were so prepared as to omit questions concerning desertion previously suggested by him. I think it clear that if the inspectors had certainly known that they were acting in opposition to the decision of the Court of Appeals, they would have been chargeable with malice in the legal sense; that is, that they would have done an act known by them not to be in accordance with their duty. This agrees with the view of an able English judge, WILSON, who said, in *Drewe v. Coulton* (1 East, 562, note *a*), that it was "not necessary in these cases to prove *express* malice. It is sufficient if malice can be implied from the conduct of the officer; as, if he had decided contrary to a last resolution of the House of Commons, then I should leave it to the jury to imply malice." Under the circumstances, the whole matter should have gone to the jury to determine whether the inspectors, having the means of information, did not so act as to show that they were unwilling to acquire the necessary knowledge, and, accordingly, substantially intend to deprive the plaintiff of a vote to which they had reason to believe he was entitled. In other words, the jury would have a right to say whether the inspectors had complied with the reasoning of the House of Lords in *Ashby* v. *White*, and had made use of the best means to obtain correct information as to the plaintiff's rights.

The result of the whole discussion may be briefly summed up. The inspectors, under the New York statute, act ministerially in putting any and all questions to a challenged voter touching his right to vote. If they ask a question not spe-

cifically laid down in the statute, but supposed by them to "tend to test his qualification to vote," they act at their peril, and will·be liable to an action, if the question does not, under the rules of law, have the supposed tendency. Even if this be not correct, and they act judicially, they are liable if they knowingly put a question which they have no right to ask. There is, in the circumstances of the present ·case, sufficient evidence of willful wrong-doing to have been submitted to a jury.

It is scarcely necessary for us to make any observation on the duty of the courts to protect the voter in the free`exercise of his right, and to see that no board of inspectors, by an undue assumption of power, shall deprive him of it. We willingly adopt, in all such cases of abuse, the masculine expressions of Lord HOLT, in the celebrated case of *Ashby* v. *White*, already referred to: "Let all people come in and vote fairly — it is to support one or the other party, to deny any man's vote. By my consent, if such an action can be tried before me, I will direct the jury to make him pay well for it. It is denying him his English right, and if the action be not allowed, a man may be forever deprived of it. It is a great privilege to choose such persons as are to bind a man's life and property by the laws they make."

As the judge erred at the trial in dismissing the complaint, the judgment must be reversed and a new trial ordered.

All concur for reversal.

All except DWIGHT, C., concur with LOTT, Ch. C. EARL, C., concurs with DWIGHT, C., in the first ground discussed by the latter.

Judgment reversed.