GEORGE D. SANDERS *vs.* ELBRIDGE L. GETCHELL and others.

Kennebec.    Opinion May 16, 1884.

*Selectmen.    Electors.    Student.    Residence.    Damages.*

By a statute of the state, selectmen are not liable for refusing to receive the vote of a qualified voter, unless their action is "*unreasonable,* corrupt or wilfully oppressive"; if corrupt or wilfully oppressive, it must be unreasonable; if not unreasonable, no liability attaches.

Their action cannot be deemed unreasonable, when the question decided by them is so doubtful that reasonable and intelligent men, unaffected by bias or prejudice, might naturally differ in their views about it, if the question is such that there is room for two honest and apparently reasonable conclusions to be reached. Reasonable mistakes are excused; unreasonable mistakes bring liability.

The question is not whether their acts appear to the officers themselves to be reasonable, but whether reasonable in fact; ignorance is not an excuse. When a person accepts a town office, he vouches for his competency to perform its duties at least ordinarily well.

The constitution of the state provides that the residence of a student at any seminary of learning shall not entitle him to the right of suffrage in the town where such seminary is situated. This does not prevent a student gaining a voting residence in such place if other necessary conditions exist. He does not acquire a residence because a student, but may acquire one notwithstanding that fact.

Bodily presence and an intention by the student to remain in such place only because a student, or only as long as a student, do not confer domicil; the intention must be more than to make the place a temporary home, or student's home merely; it must be an intention to establish an actual, real, and permanent home in such place; to remain there for an indefinite period, regardless of the duration of the college course.

The presumption is against a student's right to vote in such place, if he comes to college from out of town. His calling the place his home, or beliving it to be his home, does not legally make it such. It is not his view of the facts that governs; the facts themselves govern the question. Each case must depend upon its peculiar facts.

Where selectmen commit an unreasonable act—intending no wrong or injury—the damages should not be exemplary or severe.

ON REPORT.

An action against the selectmen of Waterville for unreasonably and wilfully omitting to place the name of the plaintiff on the

voting list and unreasonably, wilfully and oppressively refusing so to do, or to permit him to vote at the September election of 1882. The writ is dated September 23, 1882. The plea was the general issue. By the terms of the report the court were to render such judgment as may be proper. The opinion states the material facts.

*Baker, Baker and Cornish,* for the plaintiff, cited; *Asby* v. *White,* 2 Ld. Ray'd, 958; *Gardiner* v. *Ward,* 2 Mass. 244; *Kilham* v. *Ward,* 2 Mass. 236; *Lincoln* v. *Hapgood,* 11 Mass. 350; *Capen* v. *Foster,* 12 Pick. 487; *Gates* v. *Neal,* 23 Pick. 308; *Humphrey* v. *Kingman,* 5 Met. 162; *Blanchard* v. *Stevens,* 5 Met. 298; R. S., c. 4, § 71.

*F. A. Waldron,* also for the plaintiff.

*Edmund F. Webb and Appleton Webb,* for the defendants.

We maintain, first that the plaintiff was not entitled to the right of suffrage, in Waterville, because he was not a legal resident therein. Art. II of the constitution; sect. I, among other things provides, "nor shall the residence of a student at any seminary of learning entitle him to the right of suffrage in the town, or plantation, where such seminary is established." The same section requires a residence, established for three months, next preceding the election, as a qualification of an elector.

We maintain that the plaintiff left Foxboro and went to Waterville solely to obtain a liberal education at a seminary of learning; that he had no other intention or purpose and intended to leave Waterville as soon as he had accomplished his special purpose. Plaintiff said, he intended to take the two courses in Waterville, which he did, and then go to Newton. And he did just what he said he intended to do. He was a student at college and nothing else. In *Granby* v. *Amherst,* 7 Mass. 1, it was held that four years residence at Dartmouth College in the usual course had no effect whatever upon a legal settlement. Now there was no change in the plaintiff's relations, evidenced by any physical acts, after he made up his mind in 1878–9, to become a resident of Waterville. He was still a student, no new relations, only an operation of the mind; no change of occupation;

remained in the college buildings the same. His residence was still a student's residence and no other. The opinion of the Massachusetts court, 5 Met. 587, which is referred to by several witnesses, is sound law covering the facts upon which it was based, but the facts are not parallel to this case at all. The constitution's provision is different from ours.

By R. S., c. 4, § 3, the selectmen are required to be in open session to receive evidence of the qualifications of persons claiming the right to vote. In receiving the application of persons claiming the right to vote and deciding thereon the selectmen are acting in a *quasi* judicial capacity. *Donahoe* v. *Richards*, 38 Maine, 392. They are public officers, exercising a discretion in the discharge of a public duty, cast upon them by law, and they are not liable while acting in good faith, and ·without motive. The plaintiff's counsel at the time of trial relied upon the case of *Lincoln* v. *Hapgood*, 11 Mass. 350, decided in 1814, where it is held that selectmen are liable without notice. That is not law now in Massachusetts. The hardship upon public officers was so great that the legislature changed the rule of law. This decision is at variance with the law of England. *Harman* v. *Tappenden*, 1 East, 563, and with most of the states of the union.

In *Wheeler* v. *Patterson*, 1 N. H. 88, it was .held that an action would not lie against a moderator of a town meeting for refusing to receive the vote of a person legally qualified to vote, without showing malice. In this case *Lincoln* v. *Hapgood et als.* was considered and distinctly overruled. In *Jenkins* v. *Waldron*, 11 Johnson's Rep. 114, it is held that an action will not lie against inspectors of an election for refusing the vote of a person legally qualified to vote without proving malice — that officers required by law to exercise their judgment, are not answerable for mistakes in law or mere errors of judgment without any fraud or malice. *Drewe* v. *Coulton*, 1 East, 563, was an action against the defendant as returning officer of the borough of Saltash for refusing the vote of the plaintiff in an election of members of parliament, it was held that the action would not lie without proof of malice. In *Asby* v. *White*, 2 Ld. Raymond, 938, the court say "there is no instance of an action of

this sort maintained for an act arising merely from error of judgment."

In *Temple* v. *Mead*, 4 Vt. 535, the court say *quere* whether an action lies against an officer presiding for refusing to receive a legal vote where this is not malicious but only an error of judgment on a point considered doubtful.

The selectmen are acting, not in behalf of themselves, they have no interest in the matter, they have no fee, but they sit as referees or judges and the parties are the applicant claiming the right to vote—the candidates and all the qualified electors. The selectmen must decide one way or the other. They hear the evidence; they weigh it; they hear the parties and their counsel and their friends. They are acting and they decide under a solemn oath. After investigation they are to determine what is to be done. If acting in good faith, they err, it is merely what is incident to all tribunals; to hold them legally responsible, in such a case, would be to punish them for their honest convictions in a matter they are obliged to decide. *Donahoe* v. *Richards*, *supra*.

The Massachusetts cases referred to by the plaintiff's counsel have but little bearing on this case because they hold that an action lies against the selectmen in case like this without proof of malice. *Blanchard* v. *Stearns*, 5 Met. 298, on page 301, the court says the statute of that state recognizes that they may be liable; and that without proof of malice, or any wilful and corrupt purpose. That is not our statute. Our statute negatives that position, hence those decisions are not germain to this case.

PETERS, C. J. The plaintiff sues the selectmen of Waterville for refusing to place his name on the list of voters in that town for the state election held in September, 1882.

The question arises as to the extent of the liability of selectmen for refusing to receive the vote of a qualified elector. And this involves the construction of the statute, in its application to the facts of the present case, which provides that "in no case shall any officer of a city, town or plantation incur any punishment or penalty, or be liable in damages by reason of his official

acts or neglects, unless they are *unreasonable*, corrupt, or wilfully oppressive." R. S., (1871) ch. 4, § 63. The case calls for our views as to what would be an unreasonable act or neglect. If the act be corrupt or oppressive, it would surely be unreasonable. An act may be unreasonable, and fall short of being either corrupt or oppressive. The fact that unreasonableness is the least in degree of the wrongs that may be imputed to officers, supersedes the necessity of our troubling ourselves with the meaning of the other terms. If the defendants were not unreasonable in their action, no liability attaches.

The condition of the law applicable to such actions, as it stood before the statute above quoted was enacted, is instructive upon the question presented. The rule in England, and in most of the states in this country, has long been, that returning officers and inspectors of elections who are required to pass upon the qualification of voters, possess judicial functions in so doing, and are not liable to damages for rejecting a vote unless the rejection be malicious or wilful as well as wrongful. English judicial opinion at first inclined the other way, but after memorable contests over the question, such came to be the settled law of that country. Almost all the courts in this country have acted upon the same rule. Cool. Con. Lim. *617. See remarks of SHAW, Ch. J., in *Blanchard* v. *Stearns*, 5 Met. p. 300.

This doctrine, however, has its difficulties and dangers. Courts have always appreciated the fact that there are potential arguments both for and against it. The Massachusetts court, before the separation of Maine from that commonwealth, with some degree of hesitation, adopted the contrary doctrine, holding selectmen liable who merely reject a vote wrongfully. *Lincoln* v. *Hapgood*, 11 Mass. 350. That court, however, has refused to apply the principle in analogous cases; thereby making the application of the rule exceptional upon grounds of public policy. *Spear* v. *Cummings*, 23 Pick. 224. In *Capen* v. *Foster*, 12 Pick. 485, SHAW, Ch. J., said: "It has been regarded as a question of doubt and difficulty, whether, upon strict principle, a public officer who acts honestly and according to the best of his judgment, in the discharge of his duty, and who through such

honest mistake and error of judgment, denies to a citizen his right of voting, should be answerable in an action for damages."

Our own court recognized the earlier Massachusetts cases as binding on it, and applied the principle in several cases. *Lord* v. *Chamberlain*, 2 Maine, 67 ; *Jones* v. *Cary*, 6 Maine, 448 ; *Osgood* v. *Bradley*, 7 Maine, 411. But refused to apply the principle in analogous cases. *Donahoe* v. *Richards*, 38 Maine, 376, 379. The case of *Osgood* v. *Bradley*, *supra*, excited a good deal of attention, and, immediately after its announcement, the present statute, before quoted, was passed, having been first enacted in 1831.

A good deal of embarrassment has been felt by the country generally respecting the increasing difficulties standing in the way of a fair and honest administration of the duties of return-ing boards, and quite a number of the states have endeavored to correct abuses by statutory enactments. Of the act of Maine we have spoken. Massachusetts legislated upon the subject, and now requires the voter to present to the selectmen sufficient evidence of his right to vote. Mass. Gen. St. ch. 7, § 10. Rhode Island passed a similar statute. In Massachusetts the officers are still liable for refusing a vote when it is tendered with sufficient accompanying evidence. *Blanchard* v. *Stearns*, 5 Met. 298. While in Rhode Island the court holds that the selectmen act in a judicial capacity in deciding whether the evidence is sufficient or not, and are liable only for a corrupt or malicious decision. *Keenan* v. *Cook*, 12 R. I. 52. In New York, (and also in other states) the present scheme is to reduce the judicial function of officers, and confide more in the judgment and conscience of the voter. The person desiring to vote there, has the right to do so upon making affirmative answers, upon oath, to certain interroga-tories propounded to him,— the law imposing severe penalties for false answers. *Goetcheus* v. *Matthewson*, 61 N. Y. 420.

What then, in view of the history of this question, and of the difficulties and embarrassments that beset it, may be considered, generally speaking, an unreasonable act of selectmen in refusing to receive the vote of a person qualified to vote. The officers must act honestly and reasonably. If their action be such as

sensible and impartial men generally would approve, they would no doubt be justified. But cases may occur of so close and doubtful a character, either upon the law or fact, that even reasonable and impartial men would be likely to differ in their judgments upon the question. Occasionally there are contentions that could be decided either way, and the decision not be unreasonable. We think the selectmen would not be liable to an action for their refusal to receive a vote, if the question presented to them be so doubtful that reasonable and competent men, unaffected by bias or prejudice, might naturally differ in their views upon it; if the question be such that there is room for two honest and apparently reasonable conclusions to be reached. There would be no justice, under our statute, in holding selectmen to absolute legal and technical accuracy in all things. The very object of the statute was to change such a rule. The statute implies that mistakes may be made, but excuses them unless unreasonably made. The liability for error is not absolute but conditional. The presumption of correctness is with the officer. The more doubtful the case, the stonger the presumption. Says SHAW, Ch. J., in *Blanchard* v. *Stearns*, *supra*, "It is a presumption entitled to greater consideration in doubtful cases of domicil, where very competent judges might well think differently in regard to the preponderance of the evidence, and very honestly come to opposite conclusions, upon the same statement of facts."

This view of the controversy requires that town officers shall be accountable for intelligence enough to be able to perform the official services required of them at least ordinarily well. Ignorance cannot excuse them. It is not altogether whether their acts are reasonable in their own estimation, but whether reasonable in fact. Men may act unreasonably and not know it. If they knew their acts were unreasonable, they would be acting corruptly or maliciously. When a person accepts a town office, he vouches for his competency to perform its duties.

Another question is to be considered, and that is, under what circumstances does a student at a seminary of learning acquire a voting residence in the place where such seminary is situated.

The constitutional interdiction is in these terms : "The residence of a student at any seminary of learning shall not entitle him to the right of suffrage in the town where such seminary is situated." It is clear enough that residing in a place merely as a student does not confer the franchise. Still a student may obtain a voting residence, if other conditions exist sufficient to create it. Bodily presence in a place coupled with an intention to make such place a home will establish a domicil or residence. But the intention to remain only so long as a student, or only because a student, is not sufficient. The intention must be, not to make the place a home temporarily, not a mere student's home, a home while a student, but to make an actual, real, permanent home there ; such a real and permanent home there as he might have elsewhere. The intention must not be conditioned upon or limited to the duration of the academical course. To constitute a permanent residence, the intention must be to remain for an indefinite period, regardless of the length of time the student expects to remain at the college. He gets no residence because a student, but being a student does not prevent his getting a residence otherwise.

The presumption is against a student's right to vote, if he comes to college from out of town. Calling it his residence, does not make it so. He may have no right to so regard it. Believing the place to be his home is not enough. There may be no foundation for the belief. Swearing that it is his home must not be regarded as sufficient, if the facts are averse to it. Deception or misconstruction should not be encouraged. The constitutional provision should be respected.

Each case must depend largely upon its peculiar facts. The question is not always of easy solution. One difficulty is this, that all the visible facts may be apparently consistent with either theory, — that of a temporary or a permanent home. The Massachusetts court, in a discussion of the question (5 Met. 589), presents such descriptions of fact as might be of a controlling weight upon the two sides of the question, very clearly, in the following remarks : "If the student has a father living ; if he still remains a member of his father's family ; if he returns

to pass his vacations; if he is maintained and supported by his father; these are strong circumstances repelling the presumption of a change of domicil. So, if he have no father living; if he have a dwelling house of his own; or real estate of which he retains the occupation; if he have a mother or other connections, with whom he has been before accustomed to reside, and to whose family he returns in vacations; if he describes himself of such place, and otherwise manifests his intent to continue his domicil there; these are all circumstances to prove that his domicil is not changed.

"But if, having a father or mother, they should remove to the town where the college is situated, and he should still remain a member of the family of the parent; or if, having no parent, or being separated from his father's family, not being maintained or supported by him; or, if he has a family of his own, and removes with them to such town; or by purchase or lease takes up his permanent abode there, without intending to return to his former domicil; if he depend on his own property, income or industry for support; these are circumstances, more or less conclusive, to show a change of domicil, and the acquisition of a domicil in the town where the college is situated." The cases generally are of the same tenor. *Vanderpœl* v. *O'Hanlon*, 53 Iowa, 246; *Fry's Election Case*, 71 Penn. St. 302.

The facts of the case are quite beyond dispute. They were urgently presented to the defendants. There was no reason to deny or disbelieve them.

The plaintiff was thirty-two years old; left his father's home in Patten, in this state, when nineteen; never afterwards received parental support or was under parental control; visited home afterwards, only occasionally and briefly; his father's home was, soon after his leaving, changed from Patten to other places; at the age of nineteen he was in business for himself in Foxboro, Massachusetts; after coming of age he was taxed and voted for several years in that place; in 1875, at the age of twenty-four, he entered a classical school at Waterville, and in 1878 entered college there, graduating in 1882; in 1879 he formed the purpose of making Waterville his home for an indefinite period

of time, and was taxed and voted there from that date until 1882, when, against his protest, his name was by the defendants omitted from the lists; he has ever since claimed and regarded Waterville as his home, a friend's house being open to him when there, though possessing no property there of consequence, and entering a theological institution in Newton, Massachusetts, in 1882, where he has since remained as a student.

We think a man in such a situation should have had in 1882 the privilege and ability of possessing a domicil somewhere, and it could not easily be in any place unless in Waterville. To deprive him of his right to vote under such circumstances was not reasonable. That the town officers acted honestly we are not inclined to doubt. That they committed a mistake — at least an unintentional wrong — we feel convinced.

We do not, however, concur with the plaintiff that the damages should be either exemplary or severe. We think the wisest and most just conclusion, in view of all the circumstances, will be to accord to the plaintiff no greater damages than sufficient to carry the costs. In *Lincoln* v. *Hapgood, supra,* it is said: "The court would determine that a sum, comparatively not large, would be excessive damages in a case, where no fault but ignorance or mistake, was imputable to the selectmen."

*Judgment for plaintiff for*
*$25 damages.*

BARROWS, DANFORTH, VIRGIN and SYMONDS, JJ., concurred.
LIBBEY, J., did not sit, having been of counsel.