THOMAS D. GREEN, Respondent, v. WILLIAM H. SHUM-
WAY and DAMON COATS, impleaded with FRANCIS A.
THAYER, Appellants.

*Test Oath—Ex post facto law—Unconstitutionality.*

That portion of the "Act to provide for a convention to revise and amend
the Constitution," passed March 29, 1867, which provided that at the election
of delegates no person shall vote who will not, if duly challenged, take and
subscribe the following oath : "I do solemnly swear (or affirm) that I have
never voluntarily borne arms against the United States since I have been
a citizen thereof; that I have voluntarily given no aid, countenance,
counsel, or encouragement to persons engaged in armed hostility thereto ; that
I have neither sought nor accepted, nor attempted to exercise, the functions
of any office whatever under any authority or pretended authority in hos-
tility to the United States; that I have not yielded a voluntary support to any
pretended government, authority, power, or constitution within the United
States, hostile or inimical thereto ; and did not wilfully desert from the military
or naval service of the United States, or leave this State to avoid the draft
during the late rebellion."
Held void.
It violates both the Constitution of the United States and the Constitution
of the State of New York. Per Miller, J.
It is inconsistent with the just interpretation of the Constitution of the State
of New York. Per Grover, Dwight, and Clerke, JJ.
The decisions of the Supreme Court of the United States require that it be
held to violate the Constitution of the United States, but it is in no conflict
with the Constitution of New York. Per Bacon, J.
Hunt, Ch.J., and Mason and Woodruff, JJ., dissented; holding the act
valid, and not inconsistent with either Constitution.

Appeal from judgment of General Term of the Sixth District,
reversing judgment in favor of Defendants.

The complaint alleged that, pursuant to the Constitution of the
State of New York, and an act of the Legislature passed in March,
1867, a lawful election was held throughout the State on the 23d
day of April, 1867, for the purpose of choosing delegates to meet
in convention at the Capitol on the first Tuesday of June, 1867,
to revise the Constitution of the State, and to amend the same.

That each qualified elector was entitled to vote for delegates, at

large, and for delegates chosen in the senatorial district in which he might reside ; that the Plaintiff was a native-born white citizen, of full age, and a resident of the Third Ward of the city of Syracuse, which constitutes an election district; that the Defendants were inspectors of election for .said ward; that the Plaintiff was a duly qualified elector in said district on the 23d day of April, 1867, and entitled to vote ; that after the Defendants had entered upon the duties of their office as inspectors, and had duly opened the polls of such election, on the day aforesaid, the Plaintiff offered to vote, and presented a ballot for that purpose, and requested the Defendants to receive the same ; that the Defendants, fully intending to deprive him of his rights and franchises. as a citizen, refused to receive the ballot so offered, and would not, and did not, permit the Plaintiff to vote at the election, and claims one thousand dollars damages. ·

The answer of the Defendants Shumway and Coats, who appeared, recites and alleges that, by the said act of the Legislature of this State, mentioned and referred to in said complaint, the qualification of electors for the election of senatorial delegates and delegates at large, to meet in convention to revise and amend the Constitution, is prescribed, with the provision that no person shall vote at said election who will not, if duly challenged, take and subscribe the following oath, to wit: " I (A. B.) do solemnly swear (or affirm) that I have never voluntarily borne arms against the United States since I have been a citizen thereof; that I have voluntarily given no aid, countenance, counsel, or encouragement to persons engaged in armed hostility thereto ; that I have neither sought nor accepted, nor attempted to exercise, the functions of any office whatever under any authority or pretended authority in hostility to the United States; that I have not yielded a voluntary support to any pretended government, authority, power, or constitution within the United States, hostile or inimical thereto ; and did not wilfully desert from the military or naval service of the United States, or leave this State to avoid the draft, during the late rebellion."

The Defendants then allege that, at the time of the offering

of his said ballots for the election of delegates, the Plaintiff was duly challenged as an elector of said district, and required to take and subscribe the oath aforesaid; that the oath was read to him, and he refused to take and subscribe the same. And upon such refusal, the Defendants refused to receive the ballot and deposit the same in the boxes prepared for that purpose, because the Plaintiff thus refused, and returned the same to him. They aver that such refusal to receive and deposit the ballot was made for the purpose of discharging their duty as such inspectors under the act referred to, and ask for a dismissal of complaint.

The Plaintiff demurred to the answer. The Special Term, upon argument, sustained the demurrer, and ordered that the complaint be dismissed, with costs. Upon appeal to the General Term the order of the Special Term was reversed, and judgment ordered for the Plaintiff on the demurrer, and the assessment of damages, with leave to amend. The damages were stipulated at fifty dollars, and the Defendants appealed to this Court.

*William H. Shumway* and *Damon Coats*, in person, for the Appellants.

*George F. Comstock* for the Respondent.

MILLER, J.—This case involves the constitutional validity of that portion of the act to provide for a convention to revise and amend the Constitution of this State, which excludes from the privilege of voting all who refuse to take the test-oath prescribed by the act in question (Sess. Laws of 1867, chap. 194, § 2, p. 287).

I think that the oath in question was unconstitutional and invalid, for the reasons which I will proceed to state. The first subdivision of the tenth section of the first article of the Constitution of the United States provides, that "No State shall pass any bill of attainder, ex post facto law, or law impairing the obligation of contracts ; or grant any title of nobility." The provision of the act which is to be considered declares that no person shall vote at the election for delegates to said convention who will not, if duly challenged, take and subscribe an oath that he

has not done certain acts mentioned therein; and inflicts the penalty of political disfranchisement, without any preliminary examination or trial, for a refusal to take said oath.

By this enactment the citizen is deprived, upon declining to conform to its mandate, of a right guaranteed to him by the Constitution and the laws of the land, and one of the most inestimable and invaluable privileges of a free government. There can be no doubt, I think, that to deprive a citizen of the privilege of exercising the elective franchise, for any conduct of which he has previously been guilty, is to inflict a punishment for the act done. It imposes upon him a severe penalty which interferes with his privileges as a citizen, affects his respectability and standing in the community, degrades him in the estimation of his fellow-men, and reduces him below the level of those who constitute the great body of the people of which the government is composed. It moreover inflicts a penalty which, by the laws of this State, is a part of the punishment inflicted for a felony, and which follows conviction for such a crime. It is one of the peculiar characteristics of our free institutions, that every citizen is permitted to enjoy certain rights and privileges, which places him upon an equality with his neighbors. Any law which takes away or abridges these rights, or suspends their exercise, is not only an infringement upon their enjoyment, but an actual punishment. That such is the practical effect of the test-oath required by the act in question can admit of no doubt, in my judgment. It arbitrarily and summarily, and without any of the forms of law, punishes for an offence created by the law itself.

In the formation of our national Constitution, its framers designed to prevent and guard against the exercise of the power of the Legislature by usurping judicial functions, and for the punishment of alleged offenders, in advance of trial, for offences unknown to the law, and by bill of attainder, and ex post facto enactments.

Laws of this character were considered as among the most mischievous and vicious class of judicial legislation, and in England were made the instrument for gross abuse, and a tremendous

engine of political power. Resorted to in times of high political excitement, they were the means of inflicting great wrong and injustice. They sometimes affected the dead as well as the living, and were the instruments of transcendent iniquity (Dwarris, Part I. 310; 2 Story on Const. § 1344). In a free government such legislation could not be endured, and hence it was that the Constitution so emphatically prohibited it.

When the act in question was passed by the Legislature, there was no law in this State which condemned or characterized the conduct which is punished in this act, by depriving the citizen of the right of suffrage. This law creates a new crime, and makes an offence which did not previously exist. It punishes for an act which was not a crime when committed. But, even if the alleged offences incorporated in the oath prescribed were known to the law, the statute in question, in violation of the rules of the common law, pronounces judgment of condemnation without evidence, without any opportunity to defend against the charge, and without a trial. It makes the party the accuser of himself, and his refusal to acquit himself for any cause, his own condemnation. It punishes for an offence before an accusation is made and a trial had judicially, according to the Constitution and the laws of the land. It compels him, in direct violation of the fifth amendment of the Constitution of the United States, " to be a witness against himself." His refusal to testify that he is innocent operates to produce his conviction, and seals his guilt. The object of the fifth amendment last cited was to prevent the party from being called upon as a witness of his own guilt, and to insure to him a full and fair trial by due process of law. To compel him to testify would violate this provision ; and indirectly, to make a refusal to testify a cause for punishment effects the very same purpose. It is only an evasion of the provision cited, to condemn a person for a refusal to swear to innocence.

That the Federal Constitution is violated by the provision of the act to which I have referred, I entertain no doubt. It is essentially, in the particulars indicated, both a bill of attainder, or of pains and penalties, and an ex post facto law. We are not without

authority to sustain the views I have expressed; and the subject has recently undergone a thorough discussion and examination in the Supreme Court of the United States, so as to render further elaboration entirely needless.

In Cummings *v.* The State of Missouri (4 Wal. 277), a bill of attainder is defined to be a legislative act which inflicts punishment without a judicial trial. Field, J., who delivered the opinion of the Court, remarks: "If the punishment be less than death, the act is termed a bill of pains and penalties. Within the meaning of the Constitution, bills of attainder include bills of pains and penalties. In these cases the legislative body, in addition to its legitimate functions, exercises the powers and office of judges; it assumes, in the language of the text-books, judicial magistracy; it pronounces upon the guilt of the party without any of the forms or safeguards of trial; it determines the sufficiency of the proofs produced, whether conformable to the rules of evidence or otherwise; and it fixes the degree of punishment in accordance with its own notions of the enormity of the offence." The learned Judge cites cases from British history where bills of this character had been passed; and the Court held that the second article of the Constitution of the State of Missouri, which required a test-oath from priests and clergymen in order that they might continue in the exercise of their professions, and be allowed to preach and teach, constituted a bill of attainder, within the meaning of the provision of the Federal Constitution prohibiting the States from passing bills of that character.

The Court also held that the clauses of the same article, in depriving priests and clergymen of the right to preach and teach, impose a penalty for some acts which were innocent at the time they were committed, and increase the penalty prescribed for such of the acts specified as, at the time, constituted public offences, and in both particulars violate the provisions of the Federal Constitution prohibiting the passage by the States of an ex post facto law. That they further violate that provision in altering the rules of evidence with respect to the proof of the acts specified: thus, in assuming guilt instead of the innocence of the parties;

in requiring them to establish their innocence, instead of requiring the government to prove their guilt; and in declaring that their innocence can be shown only in one way, by an expurgatory oath. The learned Judge, in reference to the clause of the Constitution which inhibits the passage of an ex post facto law, says: "By an ex post facto law is meant one which imposes a punishment for an act which is not punishable at the time it was committed; or imposes additional punishment to that prescribed; or changes the rule of evidence, by which less or different evidence is sufficient to convict than was required." (See also Calder v. Bull, 3 Dall. 386–390; Fletcher v. Peck, 6 Cranch, 137.) It is clearly manifest that the law under consideration was liable to the objection, that it was both a bill of pains and penalties and an ex post facto law, within the principles laid down in the case cited. It not only inflicted pains and penalties, but it imposed punishment for acts not punishable at the time they were committed, and changed the rule of evidence as to the testimony required to convict.

In Ex parte Garland (4 Wal. 333) a similar case was presented, and it was held that an act of Congress which excludes from practising in the Federal Courts any attorney or counsellor who refuses to take a test-oath precisely like the oath required by the provision of the act in question, with the exception of the last clause, relating to desertion, partakes of the nature of a bill of pains and penalties, and is subject to the constitutional inhibition against the passage of bills of attainder, under which general designation bills of pains and penalties are included; and that, in the exclusion which the act adjudges, it imposes a punishment for some of the acts specified which were not punishable at the time they were committed, and for other of the acts it adds a new punishment to that before prescribed, and it is thus within the inhibition of the Constitution against the passage of an ex post facto law.

Independent of any views which may be entertained, the cases cited cover the question discussed, and are decisive and controlling. Any further discussion would therefore be unnecessary; but it is not inappropriate to add, that all oaths of an expurgatory

character, especially when applied as a means of punishment for past acts, not at the time recognized and known to the law as penal or criminal, have been regarded in all countries, in modern times, as odious and inquisitorial; and passed, as they usually are, in times of high excitement, upon the return of cool judgment and calm reason have been condemned and repealed by legislative enactments. Such was the case in our own State, after the termination of the Revolutionary struggle. Severe laws of such a character had been passed during that period; and even after its close, when peace had returned, rigid enactments were made which excluded from the legal profession many eminent lawyers of that generation. A more enlightened and liberal spirit, however, under the guidance of the most able statesmen and the profound jurists of that day, finally prevailed, and those who had been banished from the country were allowed to return, restored to the privileges of citizenship by the repeal of disabling laws; and, in one instance at least, where the party had the misfortune to differ from his neighbors and friends upon the great question of American independence, after years of absence and expatriation in a foreign land, was allowed to resume his former position in the legal profession, where his talents, extensive acquirements, and profound learning shed lustre upon the jurisprudence of the State, and the purity and consistency of his life to an advanced age commanded the respect, confidence, and veneration of the entire community.

I am also of the opinion that the statute in question violates the Constitution of the State of New York.

The first section of the second article of the Constitution prescribes the qualifications of electors who shall be entitled to vote "for all officers that now, or hereafter, may be elected by the people."

The second section of the thirteenth article provides for the submission of the question whether a convention shall be called "to the electors qualified to vote for members of the Legislature, and in case a majority of the electors so qualified, voting at such election, shall decide in favor of such convention for such a pur-

pose, the Legislature shall provide for the election of delegates to such convention."

This clause does not confer upon the Legislature any power to create disabilities not existing at the time under the Constitution, or to restrict the right of suffrage which the Constitution has established. It would be extraordinary if the Legislature had the right to determine who were entitled to the privilege of voting, and thus, in the exercise of an unlimited discretion, be able to disfranchise any class of citizens, when the right is already clearly established. Such a power would be liable to the grossest abuse, dangerous in the extreme, and obviously was never intended to be conferred. It is evident, I think, that the above section specifying the qualification of electors to pass upon the question whether or not there shall be a convention, plainly imports that the same electors, and no others, are qualified to vote for delegates, and any disfranchisement of any portion of said electors is a violation of this section, and therefore void.

The statute also violates section one of article one of the Constitution of this State, which declares that "no member of this State shall be disfranchised, or deprived of any of the rights or privileges secured to any citizen thereof, unless by the law of the land or the judgment of his peers." The "law of the land" does not mean a statute passed for the purpose of working the wrong, but the law which existed at the time when the alleged offence was perpetrated. The provision was intended to restrict the powers of the Legislature, and to prevent any act which would deprive a party of his rights or disfranchise him until it was ascertained judicially that they had been forfeited (Wynehamer *v.* The People, 13 N. Y. 393, 394, and 416, and cases cited). The act in question pronounces a judgment and disfranchises the elector without judge or jury, or any of the forms required by the ordinary course of legal proceedings.

It also violates section six of article one, which declares that no person shall be held to answer for a crime except on presentment of a grand jury; and the second section of the same article, which secures the right of trial by jury in all cases in which it

has heretofore been held inviolate. These objections are too apparent to require an extended discussion.

It is manifest that the case was rightly decided by the General Term ; and the judgment reversing the judgment of the Special Term, overruling the demurrer and dismissing the Plaintiff's complaint, must be affirmed, with costs.

Grover, Clerke, and Dwight, JJ., were for affirming, on the ground that the act in question violated the true intent and meaning of the Constitution of the State of New York.

Bacon, J., was for affirming, on the ground that the decisions of the Supreme Court of the United States had in effect decided that such an act as the one in question was in conflict with the Federal Constitution, but was of opinion that no provision of the Constitution of the State of New York was violated thereby.

Mason, J. (dissenting.)—By the second section of the thirteenth article of the Constitution of 1846, it is provided that at the general election in 1866, the question, " Shall there be a convention to revise the Constitution and amend the same ? " shall be decided by the electors qualified to vote for members of the Legislature ; and the section then declares, that " in case a majority of the electors so qualified, voting at such election, shall decide in favor of a convention for such purpose, the Legislature at its next session shall provide by law for the election of delegates to such convention." The Constitution prescribes the qualifications of electors who shall vote on the question of calling the convention, but is entirely silent as to the qualifications of those who shall vote for the election of delegates to such convention, but leaves the whole question to the Legislature to provide by law for such election, and there is nothing in the Constitution restricting or limiting the power of the Legislature upon this subject.

The first section of article 2 of the Constitution has no application to the case. That section is limited in terms to the election of officers under the Constitution, and cannot, upon any just or

reasonable construction, be extended to the election of delegates to frame a Constitution to supersede the existing one. Such delegates cannot be regarded as officers under the Constitution ; neither their election, nor the authority or power of the delegates, emanates from the Constitution. The people, in whom all sovereignty of government resides, who may make and unmake Constitutions, speaking through the Constitution of 1846, have said that the Legislature shall provide for the election of delegates to such convention. This delegation of power from the people to the Legislature carries with it, by implication, upon the most familiar rules of construction, all the necessary incidents to the accomplishment of the object. The number of delegates to be chosen, the time and manner of their election, and who shall vote, are all embraced in the authority conferred upon the Legislature.

This, all will agree, must be so, if these delegates are not to be deemed officers under the Constitution, which, to my mind, is very clear they are not. These delegates exercise no function of government under the Constitution of 1846. They are elected to make a government, to frame a new Constitution, and bring into existence new officers, new powers of government, and new duties. Their duties precede the government which they create. Their whole duties are to create a new government, and not to exercise any functions under the old or existing government.

This proposition is too plain for discussion, and is most ably sustained by the opinion of the Court below, upon which I am willing to repose without further discussion, as I regard the argument of this question, in the opinion of that Court, unanswerable.

This is the view which has always been taken of this subject. In the conventions of 1821 and 1846, delegates were elected who were disqualified to hold office under the Constitution, and their right to sit in the convention was never questioned.

The only remaining question in the case is, whether the Federal Constitution of the United States inhibits the legislation complained of, which prescribes the oath to be taken by the electors, when duly challenged, at the said election for delegates.

The elector, when duly challenged, is required to take and subscribe the following oath, to entitle him to his vote, to wit: "I (A. B.) do solemnly swear (or affirm) that I have never voluntarily borne arms against the United States since I have been a citizen thereof; that I have voluntarily given no aid, countenance, counsel, or encouragement to persons engaged in armed hostility thereto; that I have neither sought nor accepted, nor attempted to exercise, the functions of any office whatever under any authority or pretended authority in hostility to the United States; that I have not yielded a voluntary support to any pretended government, authority, power, or constitution within the United States, hostile or inimical thereto; and did not wilfully desert from the military or naval service of the United States, or leave this State to avoid the draft during the late rebellion."

The people of the State have the sovereign right to frame their own Constitution, and to prescribe the qualifications of electors. This is a sovereign right in the States, too long conceded to them to be now surrendered. It is, to my mind, a right unquestionably belonging to the State. This right, I concede, must be exercised in subordination to the Constitution of the United States. It cannot be exercised otherwise, while the right to regulate the elective franchise resides in the States, as there is nothing in the Federal Constitution restricting the exercise of that right. The general government is one of limited and delegated powers, and it is provided by the tenth article of the amendments to the Constitution, that "the powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." This power over the elective franchise in the States is certainly not delegated to the United States.

It only remains to be considered, whether the free and untrammelled exercise of this power to regulate the elective franchise is prohibited to the States by the Constitution of the United States. The Respondent's counsel in this case claims that it is, and that the act of the Legislature prescribing this form of oath to the elector, when challenged, is prohibited by the Federal Constitu-

tion ; and the subdivision of the ninth section of the first article of the Constitution, which declares ".that no bill of attainder, or ex post facto law, shall be passed," is relied upon as sustaining such position.

The Respondent claims and insists that the passage of this act by the Legislature which prohibited him from the exercise of his right to vote without taking this oath, is, in fact, the passage of a bill of attainder against him. This position cannot be sustained ; attainder is scarcely known in American law. There were some bills of attainder passed by the States during and shortly after the Revolution, following the English precedents. It is to English criminal law that we are to look for a definition of this constitutional prohibition. Attainder is described in English criminal law to be, that extinction of civil rights and capacities which takes place wherever a person who has committed treason or felony receives sentence of death for his crime (Burr. Law Dic., vol. 1, p. 111 ; 1 Steph. Com. 408). The person so sentenced is called attaint or attainted. He is no longer of any credit or reputation. He cannot be a witness in any Court; neither is he capable of performing the functions of a·man, for, by an anticipation of his punishment, he is already dead in law (4 Black. Com. 380 ; 4 Steph. Com. 446 ; 1 Burr. Law Dic. 111). The consequences of attainder are forfeiture and corruption of blood (4 Black. Com. 381 ; 3 id. 251 ; 1 Burr. Law Dic. 111). Tomlins describes attainder to be *attinctura*, the stain or corruption of blood which arises from being condemned for any crime (vol. 1, p. 148), and that a bill of attainder is a bill brought into Parliament for attainting persons condemned for high treason (Same, Law Dic. 145, vol. 1).·

Attainder is defined by Jacobs, in his Law Dictionary, to be the stain or corruption of the blood of a criminal capitally condemned (Jacobs' Law Dic., vol. 1, p. 163). Story says, bills of attainder, as they are technically called, are such special acts of the Legislature as inflict capital punishments upon persons supposed to be guilty of high offences, such as treason and felony, without any conviction in the ordinary course of judicial proceedings (3 Story, Com. on the Const. 209).

Bills of attainder had acquired an established and technical sig-nification long before the framing and adoption of the Constitu-tion of the United States, and were well understood by the men who framed that instrument, and no one at that day ever ima-gined that it had any reference to regulating the elective franchise. The disfranchising, by depriving of the right of suffrage of any portion of the citizens of a State, was never in any country re-garded as passing bills of attainder against them ; and no such effect can be given to this clause of the Constitution without do-ing violence to its language, and pushing it, by a forced construc-tion, beyond the well-recognized and received import of the word " employed."

It still remains to consider whether the prohibition against the passage of ex post facto laws extends to and embraces the statute in question. It is very clear it does not. These words, " ex post facto," have a definite technical signification, sanctioned by long usage. They had acquired an established definite signification long before British law was known in America. It was never un-derstood to extend beyond criminal matters. An ex post facto law is defined to be a law whereby an act is declared to be a crime, and made punishable as such, when it was not a crime when done, or whereby the act of a crime is aggravated in enor-mity or punishment. The plain and obvious meaning of this pro-hibition against the passage of ex post facto laws is, that the Le-gislature shall not pass any law after a fact done by any citizen which shall have relation to that fact, so as to punish that which was innocent when done, or to add to the punishment of that which was criminal, or to increase the malignity of a crime, or to retrench the rules of evidence so as to make conviction more easy. This is the definition laid down by the Supreme Court of the United States in Calder v. Bull (3 Dallas, 386), and fully approved by Chancellor Kent (1 Kent's Com., 8th ed. 409, 450. See, also, Fletcher v. Peck, 6 Cranch, 138). Chancellor Kent adds : " Ex. post facto laws relate to penal and criminal proceedings which impose punishments or forfeitures, and not to civil proceedings which affect private rights retrospectively " (1 Kent's Com., 8th

ed. 450). Judge Story says, in delivering the opinion of the Court in Watson et al. v. Mercer (8 Peters' U. S. 109, 110), that it has been solemnly settled by that Court, that the phrase, " ex post facto laws," is not applicable to civil laws, but penal and criminal laws only,—in short, that ex post facto laws relate to penal and criminal proceedings which impose punishment or forfeitures, and not to civil proceedings which affect private rights retrospectively, citing Fletcher v. Peck (6 Cranch, 138), Calder v. Bull (3 Dall. 386), Ogden v. Saunders (12 Wheat. 266), Satterlee v. Matthewson (2 Peters, 380), all of which fully sustain this doctrine.

This clause of the Constitution of the United States came before the Supreme Court of this State at an early day, and Judges Spencer, Kent, and Yates all expressed separate opinions, and held that this term, " ex post facto law," as used in the Constitution, was limited to criminal cases. Such is the construction put upon this clause of the Constitution by the author of the Federalist, whose extensive and accurate knowledge of the true theory and principles of our government was, probably, not surpassed by any jurist or statesman in this country. If the views above expressed are correct, this judgment must be reversed.

This statute under consideration is not in any sense a criminal statute. It creates no criminal offence, and does not undertake to define any. Neither does it prescribe any punishment for any existing criminal offence. It simply assumes to regulate the right of suffrage, and prescribes the qualifications of persons offering to vote for delegates to the constitutional convention. Such a law, I am confident, was never intended to be embraced by this constitutional prohibition.

The right of suffrage is a political right conferred by the Constitution or laws of the States, and has ever been regarded as exclusively under State control. It may be granted or withheld, or given subject to such restrictions as the majority of those in whom the sovereignty resides may deem most conducive to the public welfare. If we adopt the argument of the Respondent's counsel in this case, and sustain this judgment, I am not able to perceive why all power in the State governments to ever restrict

the right of suffrage is not struck down by this prohibition in the Federal Constitution against the passage of ex post facto laws. No State, under such a construction of the Federal Constitution, can ever withhold the right of suffrage from any persons who have heretofore enjoyed it, however much the public welfare or safety might demand it. If such an interference with the rights of the States is to be perpetrated by a forced and hitherto unrecognized construction of this prohibitory clause of the Federal Constitution, I prefer it should come to us as a mandate from the Federal Court, submitted to and obeyed, when it comes, by a direct decision of the very question itself. I do not apprehend the day will ever arrive when such a decision will emanate from that Court. The two recent decisions in that Court, which the Court below felt constrained to regard as deciding this case in favor of the Plaintiff, fall far short of determining the case at bar; and no one, it seems to me, can read the dissenting opinion of the four Judges in that case, and come to any other conclusion than that the decision in those cases was wrong, and ought certainly never to be extended.

In the first of those cases (Cummings *v.* The State of Missouri, 4 Wal. 277), it is only necessary to state that the Rev. Mr. Cummings, the Appellant, a Roman Catholic priest, was indicted and convicted in the Circuit Court of Pike county, Missouri, for a crime created by the State in its new Constitution, which the Court held was an ex post facto law to punish him for what he had done before the creation of the offence for which he was convicted. If the facts of the case were as the Court assumed them, there is nothing in that case which necessarily controverts the case at bar.

The case Ex parte Garland (4 Wal. 333) is certainly much stronger to support the Respondent's views.

The case holds the act of Congress which excluded from the practice of the law in the Courts of the United States all attorneys and counsellors of that Court who would not take what is commonly called the test-oath. It was held by the majority of the Court, in the case Ex parte Garland, that the act of Congress which required the attorneys already licensed and practising in the United States

Courts to take and subscribe the test-oath, as a condition of the right to continue to practise, was invalid, because it imposed a punishment for some of the acts specified, which were not punishable at the time they were committed, and on this ground the act was held unconstitutional. There were four of the Judges who held, to my mind, an unanswerable argument that no such effect could be attached to the act. It is very clear to my mind that the decision of the Supreme Court of the United States, in each of these cases, has given an interpretation to this clause of the Constitution of the United States never contemplated by the framers, and wholly at variance with the early expounders of that instrument, and in conflict with all the decisions of the same Court up to the time of those decisions. These cases, however, have no application to the case at bar. The statute under consideration takes away no vested right, even of any citizen of the State.

As the Constitution of 1846 does not in any manner prescribe the qualifications of electors in voting for delegates to the constitutional convention, but confers upon the Legislature the duty to prescribe who shall vote, and to determine the oath which the elector shall take when challenged, no person can claim that he is unlawfully deprived of his right of suffrage by this act. None has the right to vote except those who have the right conferred by the statute, and then only upon the terms prescribed by the statute. This act of the Legislature, under consideration, is general in terms, and requires every citizen in the State who should claim the right to vote for delegates to the convention to take the same oath, if he shall be challenged, before he shall be entitled to vote. None of the persons who were in a condition that they could not take this oath, and were consequently deprived of the right to vote for the delegates to convention, can claim that they have been deprived of any constitutional rights, for no one had the right to vote except those prescribed by this legislative act. Nothing is taken away from them, but a right to vote is given by this act to all who will take the prescribed oath. The Court below, after holding that the Constitution did not prescribe the qualifications of electors in voting for delegates to the convention, but that the

duty was devolved upon the Legislature to prescribe it, seem to have overlooked entirely the clear distinction which we have pointed out between the case of Cummings *v.* The State of Missouri and the case Ex parte Garland.

In the case of Cummings, he was already an ordained and commissioned priest; and in the case of Garland, he was already a licensed practising attorney and counsellor, having been duly licensed by the Court. In the case of this Plaintiff, he was not invested with rights as an elector authorized to vote for delegates to the constitutional convention prior to the passage of the act complained of. The statute, therefore, took away no rights from him.

There are no penalties or criminal offences created by the act, and the same is not in conflict with any constitutional provision, State or Federal. These views lead to reversal of the judgment of the Supreme Court.

HUNT, Ch.J., and WOODRUFF, J., concurred in this opinion of MASON, J.

Judgment affirmed.

JOEL TIFFANY,
State Reporter.