Mr. Justice Cox
delivered the opinion of the court.
The legislation by Congress, which has given occasion to this controversy, is as follows :
“Sec. 3926. For the greater security of valuable mail-matter, the Postmaster-General may establish a uniform system *204 of registration. But the Postoffice Department or its revenue-shall uot be liable for the loss of any mail-matter on account of its having been registered.”
“Sec. 4027. To promote public convenience, and to insure greater security in the transfer of money through the mail, the Postmaster-General may establish and maintain, under such rules and regulations as he may deem expedient, a uniform money-order system, at all suitable postoffices, which shall be designated as “ money-order offices.”
“Sec. 3929. The Postmaster-General may, upon evidence satisfactory to him that any person is engaged in conducting any fraudulent lottery, gift-enterprise, or scheme for the distribution of money or of any real or personal property, by lot, chance or drawing of any kind, or in conducting any other scheme or device for obtaining money through the mails by means of false or fraudulent pretenses, representations, or promises, instruct postmasters at any postoffices at which registered letters arrive directed to any such person, to return all such registered letters to the posmasters at the offices at which they were originally mailed, with the word “ fraudulent ” plainly written or stamped upon the outside of such letters ; and all such letters so returned to such postmasters shall be by them returned to the writers thereof, under such regulations as the Postmaster-General may prescribe. But nothing contained in this title shall be so construed as to authorize any postmaster of other person to open any letter not addressed to himself.”
“Sec. 4041. The Postmaster-General may, upon evidence satisfactory to him that any person is engaged in conducting any fraudulent lottery, gift-enterprise, or scheme for the distribution of money, or of any real or personal property, By lot, chance, or drawing of any kind, or in conducting any other scheme or device for obtaining money through the mails by means of false or fraudulent pretenses, representations or promises, forbid the payment, by any postmaster, to any such person of auy postal money-order drawn to his order or in his favor, and may provide by regulations for the return, to the remitter, of the sums named in such *205 money-orders. But this shall not authorize any person to open any letter not addressed to himself.
The effect of these provisions is, that as long as the Postmaster-General is satisfied that any one is engaged in one of the schemes or enterprises described in the statute, the person so engaged, while the ordinary mail is open to him, as to all others, for the receipt or transmission of ordinary mail matter, shall not be entitled to receive, through the mail either the registered letters or money orders provided for in the law.
On the 12th of November, 1879, the Postmaster-General issued the following order:
“ It having been represented to me that a certain M. A. Dauphin, at New Orleans, Louisiana, is engaged in conducting a scheme or device for obtaining mo.*.ey through the mails by means of false and fraudulent pretenses, representations and promises, and, being satisfied from the evidence before me that the said M. A. Dauphin is so engaged, I do hereby forbid the payment by the postmaster at New Orleans, Louisiana, of any postal money-order drawn to the order of said M. A. Dauphin; or M. A. Dauphin, secretary; or M. A. Dauphin, P. O. box 692; and the said postmaster is hereby directed to inform the remitter of said postal money-order that the payment thereof has been forbidden, and that the sum of said money order will be returned upon the presenting of a duplicate money-order, applied for and obtained under the regulations of the department.
“And, upon the same evidence, the postmaster at New Orleans aforesaid is hereby instructed to return all registered letters which shall arive at his office directed to the said M. A. Dauphin, M. A. Dauphin, secretary, or M. A. Dauphin, postoffice box 692, to the postmasters at the offices at which they were originally mailed, with the word ‘ fraudulent ’ plainly written or stamped upon the outside of such letters.”
On the 28th of December, 1879, the complainant, who is the person described in the order, filed his bill of complaint in this court against the Postmaster-General, denying the facts on which the order is grounded, denying the right of *206 the Postmaster-General to issue it, averring-irreparable injury to himself, as a consequence of it, and asking an injunction against the further execution of it. On behalf of the Postmaster-General a demurrer has been filed, assigning several causes of demurrer, in addition to the general one, that the complainant has not, by his bill, made out any title to the relief prayed.
Some stress has been laid on the pleadings in this case. The complainant’s averments are said to be admitted by the demurrer. He avers that' he is engaged in a lawful and legitimate business ; that he is not engaged in conducting or transacting any illegal or fraudulent business, and has not been engaged in conducting or participating in any scheme or device for obtaining money through the mails of the United States, or otherwise, by means of any false or fraudulent pretences, promises or representations.
If the nature of complainant’s business had been disclosed, the court might be of opinion that his business is illegal and illegitimate, and that it does amount to a scheme for obtaining money through the mails by means of false or fraudulent pretenses. Whether it be so or not is a question of law or a mixed question of law and fact. Every averment of the bill, on this subject, involves a conclusion of law ; and if there is any proposition settled in the law of equity pleadings, one is, that a demurrer does not admit conclusions of law. It admits nothing but facts properly pleaded. This rule is asserted by the Supreme Court as lately as in the case of the United States vs. Ames, 99 U. S., (9 Otto) p. 35.
But even if facts alone were properly averred in this case, the defendant would not be placed in the attitude of really admitting that he had decided a state of facts to exist, and yet that it did not exist. Eor, after all, a demurrer in equity simply demands the judgment of the court whether, even if the facts alleged in the bill be true, the complainant has shown a proper case for relief, and whether the defendant can even be called on to answer and deny them ; and, in form, it commences with a protestation against the truth of the matters alleged. Story’s Eq. Pl., secs. 446, 452.
*207 The questions, presented to the court as to the legal rights of the complainant are in no wise different from those which would arise-upon the bill alone, upon the application for an interlocutory injunction, before answer or other defence, though different questions might arise in a proper case, as to the relief.
The complainant seeks our aid upon the ground that the act of Congress and the action of the Postmaster-General in pursuance of it violate the rights and privileges guaranteed to him by the Constitution of the United States. It becomes necessary to inquire in what character he claims these rights and privileges, whence they are derived, and what are their limits. He avers that he is a citizen of the State of Louisiana and also of the United States. The two kinds of citizenship are different and have different rights and incidents. His privileges and immunities as a citizen of his State are not derived from or founded on the Constitution of the United States. As the Supreme Court of the United States say, in the Slaughter House cases, 16 Wall., 36:
“It would be the vainest show of learning to attempt to prove, by citations of authority, that up to the adoption of the recent Amendments, no claim or pretence was set up that these rights depended on the Federal Government for their existence or protection, beyond the very few express limitations which the Federal Constitution imposed upon the States ; such, for instance, as the protection against ex post fado laws, bills of attainder, and laws impairing the obligation of contracts. But, with the exception of these, and a few other restrictions, the entire domain of the privileges and immunities of citizens of the States, as above defined, lay within the constitutional and legislative power of the States, and without that of the Federal Government.”
They further say :
“ It is quite clear that there is a citizenship of the United States and a citizenship of a State, which are quite distinct from each other.”
And—
“It is only the former (the privileges and immunities of *208 the citizens of the United States) which are placed by (this clause in) the 14th Amendment, under the protection of the Federal Constitution.”
Now, it must be very plain that no rights in connection with the mail service of the United States could be derived from the laws or constitution of any State. They are not, therefore, of the class of rights that appertain to the citizens of a State as such, but they can be derived only under the Constitution and laws of the United States and can only be asserted as those of a citizen of the United States. These distinctions are adverted to in order to free this case from any confusion that the consideration of local and State legislation might introduce, and to show the true limits of the present inquiry.
There is probably no subject in the range of constitutional law, on which there is less of authoritative exposition than that of the privileges and immunities of citizens of the United States. The expression, “ privileges and immunities of citizens of the United States,” is used but once in the entire Constitution, and then only in the Fourteenth Amendment. These privileges and immunities are, to some extent, to be inferred from the restrictions upon the power of Congress contained in the Amendments, but even these restrictions refer, in a great measure, to the rights of citizens of States. United States vs. Cruikshank, 92 U. S., 551. The Constitution nowhere attempts to declare or define the privileges and immunities of citizens of the United States. The Supreme Court shrank from the effort to do so in the Slaughter House Cases. Hut they ventured to suggest some of them which owed their existence to the Federal Government, its national character, its Constitution or its laws. One of these, they say, is described in the case of Crandell vs. Nevada, 6 Wallace. It is said to be the right of the citizen of this great country, protected by implied guaranties of its Constitution—
“To come to the seat of Government, to assert any claim he may have upon that Government, to transact any business he may have with it, to seek its protection, to share its *209 offices, to engage in administering its functions. He has free access to its seaports, through which all operations of foreign commerce are conducted, to the sub-treasury, land offices and courts of justice in the several States.
“Another privilege of a citizen of the United States is, to demand the care and protection of the Federal Government over his life, liberty and property, when on the high seas or within the jurisdiction of a foreign government.
“ The right to use the navigable waters of the United States, * * * all rights secured to our citizens by treaties with foreign nations are dependent on citizenship of the United States, and not citizenship of a State.
“ One of these rights is conferred by the very article under consideration (the Fourteenth Amendment). It is that a citizens of the United States can, of his own volition, become a citizen of any State of the Union, by a bona fide residence therein, with the same rights as other citizens of that State.
“ To these rights might be added rights secured by the Thirteenth Amendment and part of the Fourteenth.” (All of which are restrictions upon the States.)
This is as far as the Supreme Court would venture to speak, and the meagreness of this schedule of rights shows how completely we are remitted to the vague and unsurveyed region of theory when we are required to define the privileges and immunities of federal citizenship.
Let us endeavor to ascertain how far the rights of the citizen in reference to the special subject presented by this case admit of definition.
The Constitution of the United States provides that Congress shall have the power to establish post offices and post roads.
This is not a duty but a power, and like all the other powers enumerated in the 8th section of the 1st article, the extent and mode of its exercise depends entirely on the discretion of Congress. They might decline to exercise the power at all, as they have declined to exercise others of their powers, or they might have left the whole work of mail *210 communication between the different parts of the country to the States or to individual enterprise.
If Congress shall- choose to exercise this power, what constitutional limitations are there upon it ? In express terms, absolutely none. Congress may, therefore, provide just such mail facilities as they think proper, and may, from time to time, change and regulate the whole postal system in their discretion. When they have exercised this power, it,is simply a discretionary provision for the business needs of the public. The whole postal system is a mere business accommodation for the people. The privileges it confers are simply of legislative creation and are subject to legislative destruction. It cannot, therefore, be said that the citizen of the United States has an absolute constitutional right, or in other words, that it is one of the privileges of his citizenship, that his letters should be carried by the United States at all; and still less, that they be carried in any special manner. Whatever rights he may have in this respect, exist in the discretion of the legislature, and are entirely different from those fundamental rights to life, liberty and property, which are secured by the Constitution.
Since, then, Congress may, or not, in its discretion, provide a postal system for public convenience, it is difficult to say what conditions it may not impose to its use and enjoyment. It is not contested that Congress may exclude from the mail any matter which they deem prejudicial to public morals.
The Supreme Court say, in Ex parte Jackson, 6 Otto, 727:
“ The power possessed by Congress embraces the regulation of the entire postal system of the country. The right to designate what shall be carried necessarily involves the right to determine what shall be excluded.”
But while the absolute right of the citizen to have this business convenience provided for him cannot be maintained, it may be said that the right exists under the Constitution conditionally ; that if Congress shall once exercise its discretionary power it cannot discriminate between persons or *211 classes of persons ; it must legislate for all alike; all the citizens of the United States have a constilutional right to equal participation in the benefits of legislation and the use of any instrumentality created by it, unless, at least, the exclusion be imposed by way of punishment for crime, and that after due conviction only ; and that any condition destructive of this equality is repugnant to the spirit of the Constitution.
This principle of equality is not, in terms, asserted in the Constitution. The nearest approach to it is in the requirements of the 8th section, that all duties, imposts and excises shall be uniform throughout the United States, and that no preference shall be given by any regulation of commerce or revenue to th§ ports of one State over those of another. Nevertheless, it may be admitted to be a theoretical principle underlying all republican government. But when we come to apply it to particular cases, we shall find that it can be accepted only with distinctions and qualifications. If, for example, it be absolutely true, what is to be said of the franking privilege? On the 21st of March, 1800, Congress enacted, “ That all letters and packages to and from Martha Washington shall be received and conveyed by post free of postage for and during her life.” And so likewise, various acts of Congress have allowed other classes of persons to send letters by the public mails without expense. The rest of the people are compelled to pay for this privilege, and consequently they are made, to a certain extent, to maintain the mail service, at their expense, for the benefit of the favored few. If it be said, as it doubtless may, that the convenient dispatch of public business requires this exclusive privilege to be created, it only follows that in some cases this principle of equality must yield to other considerations. If it must be rigidly applied to all cases, then would not every citizen be entitled to his mandamus to compel the post office to receive and transmit his mail matter-free of expense to him, if any are so favored ? The same may be said of pensions. Time and again they are granted, not as part of the terms of public service, but altogether gratuitously. *212 The mass of the people pay these gratuities to the few. Would every citizen be entitled to demand an equal share in this species of bounty, because it is bestowed upon some ? Or, on the other hand, is it not to be justified on the ground that this generosity is calculated to stimulate zeal in the public service and reconcile to its risks'?
The same rule of equality which can be invoked as to privileges must also apply to immunities, such as exemptions from taxation. We know that these exemptions are sometimes granted to encourage enterprise, but this would be absolutely forbidden, and would require a general remission of all taxes, where some are thus relinquished, if the rule of equality be inflexible. And so with the regulation of commerce by Congress. We know that the power of Congress to impose discriminating duties, with a view to the protection and encouragement of domestic manufacture, has been a subject of much legislative debate, but for all practical purposes, and as far as any judicial power of interference is concerned, it cannot be gainsaid. One class of importers, by this system, is less burdened than others, and a part of the community in effect pays a bounty to another part. It was never supposed, however, to be in the power of the court to correct this inequality.
And so, with regard to the agencies of the Federal Government, created in the exercise of its incidental powers. Congress may borrow money on the credit of the United States, and, as incidental to this power, may issue its obligations in the shape of bonds exempted from taxation. In this way, it enables citizens and corporations to hold property free from taxation to which others are subjected. And so it created a corporation—the bank of the United States— which was held free from the taxation to which other corporations were subject. The result is that even inequality of benefits and burdens might be created when necessary and proper as a means of executing the express powers of Congress.
These are cases of privilege given to the few, to the exclusion of the many. Privileges to the many to the exclusion *213 of the few, would seem at least equally justifiable. The cases of special exclusion from the elective franchise, referred to hereafter, show this.
These illustrations serve to show that while the general theory is admitted, that legislation must be for the equal benefit of all citizens, yet considerations of public necessity of the general welfare, of national policy, &c., must predominate over the rule in particular cases.
Other illustrations are suggested by the Slaughter House cases before referred to.
An exclusive right had been given by law to a private company, to establish the landings for cattle, and the places where they should be slaughtered, in New Orleans. Everybody was forbidden to slaughter elsewhere. It was claimed that this virtually destroyed the business of the butchers not connected with this company. But this court say : “ Unwholesome trades, slaughter houses, &c., &c., may all, says Chancellor Kent, be interdicted by law, in the midst of dense masses of population, on the general and rational principle that every person ought so to use his property as not to injure his neighbors, and that private interests must be subservient to the general interests of the community. This is called the police power. * * * * This power is, and must be, from its very nature, incapable of any very exact definition or limitation. Upon it depends the security of social orders. * * * Persons and property are subjected to all kinds of restraint and burdens, in order to secure the general comfort. Of the perfect right of the legislature to do this, no question ever was or ever can be made,” &e.
There can be no doubt that this police power extends to moral as well as physical evils. A State may prohibit the existence of lotteries, gift enterprises, &c., in the interest of public morals. If it can do this, then, as the greater power includes the less, it may hamper and restrict them, and discourage them by conditions or denial of privileges not made applicable to other occupations. If, for instance, a State controlled the mails within its limits, although this principle of equality is equally at the foundation of the State and *214 Federal Governments, it is not perceived why it might not be overruled, so to speak, by the State, in the exercise of its police power, by denying the use of the mails to all persons engaged in these forbidden pursuits, for the purpose of preventing the dissemination of corrupting matter.
If the States might do this, so might Congress thus legislate in the territories and the District of Columbia. And when persons seek the aid of the Federal Government and the use of its agencies, they put themselves as completely within the domain of the Federal authority, for purposes of regulation, prohibition and exclusion, as if they were within the exclusive territorial jurisdiction of the United States.
Now, what the legislation of Congress, now under consideration, proposes, is, substantially, to offer to all persons the convenience of registration of letters containing valuable ^matter, excepting letters addressed to those who are shown, to the satisfaction of the Postmaster General, to be engaged in lotteries, gift concerts or other similar enterprises, and these it excludes and refuses to deliver in the interest, it is presumed, of public morals, and because it is almost, if not quite, impossible otherwise to prevent this public convenience from being made an instrument of corruption. If it be shown or conceded that the rule of equality can be departed from on any ground,.it is impossible to deny that it may be, when this is deemed necessary by Congress, to prevent a great evil, and to prevent what is designed for a blessing from being converted into a curse.
Congress has the express power to establish post offices and post roads. According to the Supreme Court, this not only means that they may establish the offices and roads, but also that they may carry the mail, admit and exclude what matter they please. They have declared that certain matter shall be excluded, as they have the right to do. As incidental to this power, they have the power to punish those who rob the mail (McCulloch vs. Maryland), and also those who disobey this law. They are forbidden, however, to seize and search private papers. (Amendments, Art. 4). Then, what more necessary and proper means of excluding forbid *215 den matter, than to deny the use of the mails to those who are known to be using them for forbidden objects ? If this be the case, the mere inequality produced by such legislation will .not be fatal to its validity, according to the illustrations we have given, and some other principle of the Constitution must be invoked, in order to overthrow it.
’ The application of the principle of equality to this case would be, that Congress has no right to.provide these special mail facilities for the innocent, without at the same time conceding them to be notorious and professional wrongdoers, to whom they would afford the most powerful agency for wrongdoing, and that the latter must have the same use of the Federal agency as others, until accident shall betray their use of it, and this shall be folkwed by judicial conviction. We cannot believe that the Government is bound to such an inflexible rule of equality, as will involve these results.
The right of every citizen to the benefit of the discretionary legislation of Congress must be subject to the necessities of public health, morals, order, and the general welfare, and the efficient execution of the powers expressly conferred by the Constitution.
We have, so far, discussed the general theory of the obligation of the Government to legislate without discrimination. Assuming this obligation to exist, however, there is still a difficulty in treating it as one enforceable by the courts.
Let us take, for illustration, the franking privilege. If Congress has no power to' grant this to a limited number of persons, how is their action in doing so to be judicially remedied ? It must either be by preventing the favored few from enjoying the privilege, or it must be by extending it to all. Would the first be possible ? Could any citizen, not admitted to the privilege, come into court and have the Postmaster General enjoined from transmitting anybody’s mail matter under a frank, because the complainant • is debarred from that advantage ? Plainly, such an attempt would be futile. On the other hand, could he obtain a mandamus compelling the Postmaster General to receive and *216 transmit his mail matter free of charge, because others are allowed that privilege ? Without a word in the statute or in the Constitution to warrant it, could the court administer such relief upon the abstract principle of equal rights ? If so, the court would be extending the law to objects not embraced in it, and this would be legislation. It would be an attempt to supply an omission in legislation, and to discharge for Congress a supposed duty to which it had been delinquent. All this is clearly impossible, and these inquiries show that this theoretical duty of Congress to legislate equally for all, belongs rather to the class of imperfect obligations of which Paley speaks, which cannot be enforced because they are indeterminate, and must be left to the judgment and conscience of the party charged with them, such as the duty of those in power to appoint the most worthy to office, &c., &c.
Apply these reflections to the present case. The act of June 8, 1872, c. 335 (Rev. Stats., sec. 3926), authorizes the Postmaster General to establish a uniform system of registration, but, at the same time, it authorizes, or, more correctly speaking, it directs him to refuse to deliver registered letters addressed to persons who are proved to him to be engaged in fraudulent lotteries, &c., &c. It is, in short, an oiler of this convenience of registration to all persons except those so described. Supposing Congress to have been wrong in this, and that it was their duty to extend this convenience indiscriminately to all persons, how can the court so extend it without encroaching upon the legislative functions of Congress ? The supposed wrong here would be a negative one, and would consist, not in a positive encroachment upon some rights existing independently of this law, but in the mere exclusion from the benefits of the law, of certain persons, and this could not be remedied without amending the law itself, which is beyond the power of the courts.
We have, so far, discussed only the objection to the act of Congress, that it discriminates between citizens who are entitled to share its benefits equally.
There are, however, other-serious questions relating to its *217 supposed conflict with important provisions of the Constitution. It is argued, that to deny to a citizen the benefits of the act of Congress, especially on the ground that he is engaged in an unlawful occupation, is punishment, and that to ° authorize the Postmaster General to execute the provisions of the law, in this respect, is to authorize the infliction of this punishment without due process of law, in defiance of the guaranties of the Constitution, and is equivalent to investing him with judicial power which can only be lodged in the courts.
The term “ punishment ” is only used twice in the Constitution, viz., in Article III, which empowers Congress to declare the punishment of treason, and in Article VIII of the Amendments, which declares that excessive bail shall not be required nor excessive fines imposed, nor cruel and unusual punishments inflicted. But Article V of the Amendments also declares that no person shall be deprived of life, liberty or property without due process of law.
The rights to life, liberty and property are not the creature of legislation, or of the Constitution, but they are recognized by the Constitution as rights already in existence, which it seeks to protect from legislative encroachment. The Declaration of Independence asserts that men are endowed bp their Creator with certain inalienable rights; that among these are life, liberty, and the pursuit of happiness ; that to secure these rights, governments are instituted among men. The right to liberty and the pursuit of happiness includes the right to acquire and enjoy property. These are the rights then—fundamental, natural, and antedating all constitutions—which this amendment was designed to protect. To deprive of these would be punishment, except where property is taken in the exercise of the right of eminent domain.
But how far does this amendment apply to mere privileges created by legislative authority ? What property exists in these which a legislative act may not destroy ? We do not, of course, refer to rights acquired by grant of property, corporate franchises, &e., for a consideration, which become ves *218 ted rights of property by virtue of executed contracts,but to mere privileges and conveniences gratuitously provided by Congress, matters, not of right, but of grace, such as the franking privilege before referred to, or the privilege of sending registered letters, or money orders, provided for by this law. Can anybody question the power of Congress to repeal the whole law relating to registration of letters, or to authorize the Postmaster General to suspend or abolish the system of registration which he was authorized to establish, in his discretion. And if Congress should repeal the law on the very ground of the abuses to which the registration had been perverted, or should authorize the Postmaster General to suspend or abolish the system, when he should think such abuses required it, would the validity of such act be any more questionable ? There can be no doubt of the power of Congress in such case, because the act of Congress is an act of discretionary legislation, creating no vested contract rights and essentially repealable. And, yet, if the constitutional pi’ovision be applicable to such a case, according to the argument for complainant, this would be punishment, without due process, of the most indefensible kind, because it would involve alike the innocent and the guilty. If the repeal of this law could not be held to deprive the people generally of their property without due process of law, then the withdrawal from the complainant of the right to receive registered letters, even supposing him to have been previously entitled to it under the law, cannot be said to have such effect as to him, unless such effect be found in the mere fact of discrimination against him. Whether this be so will depend upon the question already discussed, viz., whether the complainant has a constitutional right to this privilege of registration, simply because others have it. For if he has not, as we think has been sufficiently shown, then the withdrawal of the privilege from him, while others still retain it, does not deprive him of any property in the constitutional sense of the term.
The argument for complainant ignores the distinction between the punitive and the preventive features of the *219 legislation of Congress on this subject. Section 3894 of the Revised Statutes imposes a fine on any one who shall knowingly deposit in the mail any letter, &c., concerning lotteries, gift enterprises, &c. The imposition of a fine would be taking the property of a party accused, and could not be authorized to be done by the Postmaster General, or otherwise than in a due course of judicial proceeding. But section 3929 of the Revised Statutes authorizes that officer to direct his subordinates to refuse the delivery of registered letters to persons engaged in the lottery or other fraudulent business, and to return them to the writers. This is prevention, resorted to because of the difficulty or impossibility of detection. Its object is, plainly, not to punish, but to preserve the mail from misuse. And that this object distinguishes it from a punitive measure, is a proposition supported by authority, as will presently be shown. Congress might have provided by section 3894, supra, that parties guilty of the acts mentioned should, after conviction, and as a part of the penalty, be excluded forever from the use of the registration system, and in a certain sense, this would then be punishment. But it is a non sequitur that such exclusion could not be authorized in a different way, without being punishment. Whether it is so intrinsically, in any constitutional sense, depends entirely on the question whether it is a deprivation of any right of property, as distinct from the mere withdrawal of a gratuitous indulgence.
The cases of Cummins vs. The State, and Ex parte Garland, 4 Wall., 277, 333, have been cited and relied- on. Cummins was indicted for teaching and preaching as a priest of the Roman Catholic church, without taking a certain expurgatory oath, having reference to the late rebellion, prescribed by the new constitution of Missouri, adopted in 1865, which declared persons who had done certain acts incapable of holding any office or acting as teacher or professor in any school in the State, &c. It, in fact, forbade the accused from pursuing his lawful calling, unless he could take this oath, or, in other words, if he had theretofore done any of the acts in aid of the rebellion enumerated in the *220 constitution.' Now it is evident that this interfered as much with his liberty and property as if it had imposed imprisonment or a pecuniary penalty, and, therefore, was punishment, and the law imposing it was held to be a bill of attainder, for which reasons the court held it void.
Justice Field says:
“¥e do not agree with the counsel of Missouri, that to punish one is to deprive him of life, liberty and property, and that to take from him anything less than these is no punishment at all. The learned counsel does not use these terms—life, liberty and property—as comprehending every right known to the law. He does not include under liberty, freedom from outrage to the feelings as well as restraints on the person. He does not include under property, those estates which one may acquire in professions, though they are often the source of the highest emoluments and honors. The deprivation of any rights, civil or political, previously enjoyed, may be punishment, the circumstances attending and the causes of the deprivation determining this fact. Disqualification from office may be punishment as in cases of conviction. Disqualification from the pursuits of a lawful avocation, or from positions of trust, or from the privilege of appearing in the courts, or acting as executor, &c., may also, and often has been, imposed as punishment.”
And again—
“The theory upon which our political istitutions rest is, that all men have certain inalienable rights—that among these are life, liberty and pursuit of happiness, and that in the pursuit of happiness, all avocations, all honors and all positions, are alike open to every one, and that in the protection of these rights all are equal before the law. Any deprivation or suspension of any of these rights, for past conduct, is punishment, and can in no otherwise be defined.”
In other words, the court find fault with the narrowness of counsel’s interpretation of the terms liberty aDd property, and consider them as not confined to mere freedom of the person from restraint, and mere tangible property, but as *221 embracing the right to pursue all lawful avocations and honors, and hold any deprivation of them as punishment.
The same views, in substance, were enunciated in the case of Ex parte Garland, where the question arose upon the constitutionality of an act of Congress excluding all persons from practice in the Federal courts who would not take an expurgatory oath that they had voluntarily given no aid, &c., to persons engaged in armed hostility to the United States. Garland had previously been admitted, in 1860, to the Supreme Court of the United States. The court take the same distinction which I have asserted between matters of right and those of mere privilege. They say:
“The profession of an attorney and counsellor is not like an office created by act of Congress, which depends for its continuance, its powers and its emoluments upon the will of its creator, and the profession of which may be burdened with any conditions not prohibited by the Constitution.
“ The attorney and counsellor being by the solemn judicial act of the court, clothed with his office, does not hold it as a matter of grace and favor. The right which it confers upon him to appear for suitors and to argue cases is something more than a mere indulgence, i’evocable at the pleasure of the court, or at the command of the legislature. It is a light of which he can only be deprived by the judgment of the court for moral or professional delinquency.”
The difference between the majority and the minority was on this question, and is thus expressed in the dissenting opinion:
“ The right to practice law in the courts as a profession, is a privilege granted by the law, under such limitations and conditions in each State or government as the law-making powers may prescribe. It is a privilege, not an absolute right.”
The distinction between absolute rights and mere legislative privileges, which I have dwelt upon, is still more strongly brought out in other cases.
The constitution of Maryland of 1864 restricted the right of suffrage in that State as it had previously existed, and *222 disqualified from voting all persons who had given aid or support to the rebellion, and required the officers of registration carefully to exclude all persons so disqualified from voting or being registered. No one was to vote unless registered, and unless he would take an oath that he had not given aid, &c., but even this oath was not to be conclusive evidence of his right to vote. The officers of registration were in effect made the judges to determine the citizen’s right to the exercise of the elective franchise.
In the case of Anderson vs. Baker et al., 23 Md., 531, the petitioner applied in the circuit court of Montgomery county, Maryland, for a mandamus to compel the officers of registration to register his name on the column of legal voters in his county. The petition being dismissed, an appeal was taken to the court of appeals. The new constitution was assailed in respect to this provision, on the ground that the right of suffrage is property and an inalienable right, that to deprive the citizen of it is punishment, and when it is for past acts it is ex post facto punishment, and the constitution, in the provisions in question, is both a bill of attainder and an ex post facto law.
But the court, with one dissenting opinion, controvert those positions, and show “ that the subject of suffrage is exclusively within the control of the State, is given to or withheld from persons at the will of the State ; that there is no State in which all persons enjoy it, and it is not a natural, inalienable right, and it may be enlarged or contracted at the pleasure of the State. If it can be done without regard to the conduct of the citizen, certainly nothing done by him could subject the power to limitation. The object arid intention of the law determines whether it is merely preventive or punitive. Being the former, though accompanied by the withdrawal of privileges previously enjoyed, it is not necessarily the latter. The political power of the State, its preventive means, are not to be confounded with the assumption of judicial powers by a convention or legislate.”
This case goes further than is necessary for the present *223 case, because the constitution in question withdrew certain privileges from parties in consequence of past conduct, and at least provoked attack as in conflict with the ex post facto prohibition of the Constitution of the United States, but it is valuable as showing the difference between fundamental rights and those created by and changeable by positive law ; and as showing that the exercise of discretionary power in this direction for preventive purposes is not to be confounded with punishment, or to be condemned on the mere ground of its discriminating and unequal operation.
In the case of Blair vs. Ridgely, 4 Missouri, 63, the same question was presented, and the distinction I have above taken was sustained. The court say:
“The doctrine of the Supreme Court of the United States in the Cummins case, proceeds on the idea that a right to pursue a calling or profession, is a natural and inalienable right, and that a law precluding a person from pursuing his calling or profession, on account of past conduct, is inflicting a penalty, and therefore void. There are certain rights w'hich inhere in aud attach to a person, aud of which he cannot be deprived, except by forfeiture for crime, whereof he must be first convicted by due process of law. These are termed material or absolute rights.”
Blackstone says:
“ By the absolute rights of individual, we mean those which are so in their primary and strictest sense, and which would belong to persons merely in a state of nature, and which every man would be entitled to enjoy, whether out of society or in it. These rights may be arranged under the following heads:
1. The right of personal security. 1. The right to personal liberty. 3. The right to acquire and enjoy property.
“ * * * The right, then, to life, liberty aud pi’ivate property is natural, absolute and vested, and belongs as well to the individual in a State unconnected with society, as in the most carefully guarded and well arranged system of government. He cannot be deprived of life without due process of law. He can be restrained of his liberty only by *224 the same means; and his right to acquire and enjoy property, reap the fruits and earnings of his own industry, should be fully guaranteed and protected. A man may be said to have a special property in the profession or calling by which means he makes his support, and that he can be deprived of it only in the usual manner and according to the common forms of law. * * * But is the right to vote or exercise the elective franchise a right, either natural, absolute or vested ? ” &c.
And then the court proceed to show that it is not, and is, therefore, not protected by the provisions of the Constitution.
It is proper to add that in the case of Greenway vs. Shumway, 39 N. Y., 418, a majority of the Court of Appeals of New York—four out of seven—held a law of New York unconstitutional, which exacted an expurgatory oath, similar to that described in the preceding cases, of persons offering to vote for members of a constitutional convention.
Two of the majority, however, considered the law to be in conflict only with the constitution of New York, and two only considered it to be in conflict with the Constitution of the United States, and to fall within the ruling in the cases of Cummins vs. The State and Ex parte Garland, while three held the same opinions as the Maryland and Missouri courts.
The distinction, then, between fundamental rights protected by the Constitution from legislative interference, and mere temporary privileges created by legislation, being sufficiently established, there can be no doubt that the rights claimed by this case fall within the latter class of rights.
But it is said that the sending back of registered letters to the writers is depriving the complainant of his property in those addressed to him. This objection assumes the very question in dispute.
It is certain that the mode of transferring property is regulated by positive enactment. Congress may declare the effect of depositing letters in the mail, in this respect, and determine whether that act shall operate to transfer property to the party addressed, or at what stage of transmission *225 this effect shall take place. They have, in effect, determined this by the legislation under consideration. While they undertake to convey letters through the ordinary mail for the benefit of the party addressed, they declare, in this law, that no right shall accrue to him to registered letters, under certain conditions, but that the right shall remain in the writers and the letter shall be returned to them. And this is evidently done in the interest of the writers, and to protect them from being defrauded of their money. They refuse to deliver registered letters to certain parties. If the postmaster refused to allow them to be deposited in the mail at all, it could not be pretended that the party addressed is deprived of his property. But if letters are deposited under the known condition prescribed by law, that in certain contingencies they are not to be delivered, but to be returned to the writers, and so put in the same condition as if they had not been deposited, is not the effect precisely the same ?
The term “ due process of law ” in the Constitution, received some consideration from the Supreme Court of the United States, in the case of Murray’s Lessee et al. vs. Hoboken Land and Improvement Co., 18 How., 272.
It was there held that in order to ascertain whether any process exacted by Congress is due process, in the constitutional sense, we must first examine the Constitution itself, to see whether it be iu conflict with any of its provisions, and if it be not, we must look to those settled usages and modes of proceeding existing in the common and statute law of England, before the emigration of our ancestors, and shown to b.e not unsuited to their civil and political condition by having been actedon by them after the settlement of this country. And the court proceed to show that due process does not necessarily require a judicial proceeding, and that a proceeding authorized by act of Congress of 1820, whereby, upon the auditing of the accounts of a collector of customs by the first Auditor of the Treasury, and the ascertainment of a balance to be due from him to the United States, a distress warrant issued by the solicitor, in pursuance *226 of which his land was sold, without any action at law or judgment, was due process of law, because it had a precedent on the proceeding for recovery of debts due the Crown in England and similar proceedings in the States. They further show that, though due process of law generally implies and includes actor, reus, judex, regular allegations, opportunity to answer and a trial according to some settled course of judicial proceedings, yet this is not universally true, but process may issue, final in its character, against the property of debtors to the public, in the shape of distress warrants, &c., without judicial proceedings.
But the terms due process of law as employed in the Constitution, apply only to the fundamental rights referred to in that instrument and are inapplicable to mere privileges of legislative creation. As to these, the law of England furnishes no precedent, but the law of their creation determines the terms and conditions of their enjoyment and by what process they shall terminate.
The objection that the statute under consideration attempts to clothe the Postmaster-General with judicial power is mainly founded upon the assumption, which we consider erroneous, that his action in pursuance of it is virtually a trial of and a penal judgment against the party affected by it. But if it be not so, as has been shown, there is no ground for the objection. There is probably not an important office in the executive departments in which it is not necessary to exercise judgment in such manner as to affect private interests in carrying the laws into effect, and yet that this is the exercise of the judicial power of the United States, which belongs only to its courts, has not been pretended.
Thus, in the above case of Murray’s Lessee et al. vs. Hoboken Land and Improvement Co., the Supreme Court says:
“ That the auditing of the accounts of a receiver of public moneys may be, in an enlarged sense, a judicial act, must be admitted. So are all those administrative duties the performance of which involves an inquiry into the ex *227 istence of facts and the application to them of the rules of law. In this sense, the act of the President in calling out the militia, under the act of 1795 (12 Wheat., 19), or of a commissioner who makes a certificate for the extradition of a criminal, under a treaty, is judicial. But it is not sufficient to bring such matter under the judicial power that they involve the exercise of judgment upon law and fact. United States vs. Ferreira, 14 How., 40.”
• The law of patents furnishes another illustration of this. Congress has power to secure to inventors, for limited times, the exclusive right to their discoveries, and they have undertaken to do so by various laws. But the questions whether a patent shall issue for an invention claimed, or to which of competing claimants, and whether it shall be extended after its expiration, are questions determined by other officers than the courts of the United States, and often after much controversy and upon laborious investigation of evidence and involving great interests, and yet it was never whispered that this was the exercise of the judicial power of the United States.
The Land Office and all the bureaus in the Treasury and Interior Depártments are theatres of quasi judicial hearing and determination. And so, in order properly to execute the law under consideration, the Postmaster-General must decide to what persons the law applies, and whose letters it directs him not'to deliver, and this is the exercise of administrative judgment aud not judicial power.
On the whole, the court is of opinion that the act of Congress complained of is constitutional, that the order of the Postmaster-General is in conformity with the law, and, consequently, that the bill presents no proper case for the interposition of the court and must be dismissed.